UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RODERICK COVLIN,

                              Petitioner,

            v.

MARLYN KOPP, *Superintendent, Sing Sing Correctional Facility, Ossining, New York*,

                         Respondent.

Case No._____

 

**RODERICK COVLIN'S PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254**

Seth J. Zuckerman

ZUCKERMAN LEGAL GROUP
14 Penn Plaza, Suite 814
New York, New York 10112
(212) 563-5655
seth@zuckermanlegalgroup.com

*Attorneys for Petitioner
Roderick Covlin*

## <u>TABLE OF CONTENTS</u>

**PAGE**

INTRODUCTION…………………………………………………………………...………... 1

BACKGROUND………………………………………………………….……………….... 2

   I.     Factual Background……………………………………………………..…………… 2

       A.  The Covlin's Marriage and Divorce………………………………………………2

       B.  Ms. Covlin's Death……………………………………….……………………… 3

       C.  Subsequent Events…………………………………..……………………… 7

   II.    Procedural History……………………………………………………………… 13

       A.  The People's Prior Bad Act Evidence…..…………………………………………… 13

       B.  The Trial…………………………………………………………..….……... 18

          1.  The People's Opening Statement……………………...…………………….. 18

          2.  The Silent Prison Surveillance Video…………………………………….…..... 19

          3.  Evidence of Ms. Covlin's Osteoporosis…………………….…………………... 24

          4.  The People's Summation……………………………...………………….. 25

       C.  Post-Conviction Proceedings……………………………..……………….. 37

STANDARDS OF REVIEW………………………………………………….……….…… 40

ARGUMENT………………………………………………………………………..….…….43

   I.     Mr. Covlin Has Satisfied All the Procedural Requisites for Review………………... 43

       A.  Mr. Covlin's Petition Is Timely…………………………………………....43

       B.  Mr. Covlin Has Exhausted His State-Court Remedies…………………………… 44

       C.  No State-Law Procedural Default Bars Federal

           Review of Mr. Covlin's Petition……………………………………………… 45

   II.    The Prosecution Violated Mr. Covlin's Sixth and Fourteenth Amendment Rights to

        the United States Constitution…………………………………………………… 46

       A.  Mr. Covlin's Right to Due Process Was Violated by Pervasive Prosecutorial

          Misconduct………………………………………………………………… 47

       B.  Mr. Covlin's Right to Due Process Was Violated by the Trial Court's Admission of

          Misleading Evidence Important to the Prosecution's Case in Chief………...……… 54

C.  Mr. Covlin's Right to Confrontation Was Violated by the Trial Court's Refusal to Allow Him to Cross-Examine a Witness Central to the People's Case in Chief…………………………………………………………………………… 56

D.  Mr. Covlin's Right to Due Process Was Violated by the Trial Court's Admission of Propensity Evidence…………………………………………………………… 57

E.  Mr. Covlin's Right to Due Process Was Violated by the People's Failure to Preserve Potentially Exculpatory Evidence…………………………………………...… 62

CONCLUSION………………………………………………………………...…………... 65

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Andrew v. White,*
 604 U.S. ----, 145 S. Ct. 75 (2025) ……………………………………………………59, 60

*Arizona v. Youngblood,*
 488 U.S. 51 (1988) ………………………………………………………2, 43, 47, 63

*Berger v. United States,*
 295 U.S. 78 (1935) ………………………………………………………*passim*

*California v. Trombetta,*
 467 U.S. 479 (1984) ……………………………………………………..62, 63, 64

*Clark v. Perez,*
 510 F.3d 382 (2d Cir. 2008) ……………………………………………………..42

*Clemente v. Lee,*
 72 F.4th 466 (2d Cir. 2023) ……………………………………………….. 41

*Coleman v. Thompson,*
 501 U.S. 722 (1991) …………………………………………………… 42

*Cone v. Bell,*
 556 U.S. 449 (2009) …………………………………………………… 41

*Crawford v. Washington,*
 541 U.S. 36 (2004) ………………………………………………………*passim*

*Dillon v. Conway,*
 642 F.3d 358 (2d Cir. 2011) …………………………………………… 41

*Donnelly v. DeChristoforo,*
 416 U.S. 637 (1974) ……………………………………………………..*passim*

*Ford v. Georgia,*
 498 U.S. 411 (1991) …………………………………………………..42

*Jackson v. Conway,*
 763 F.3d 115 (2d Cir. 2014) …………………………………………….42

*Johnson v. Ross,*
 955 F.2d 178 (2d Cir. 1992) …………………………………………….58

*Katowski v. Greiner*,
  212 F. Supp. 2d 78 (E.D.N.Y. 2002) ……………………………………………………58

*Lee v. Kemna*,
  534 U.S. 362 (2002) …………………………………………………………………… 42

*Moise v. Fields*,
  2021 WL 5316133 (S.D.N.Y. Sept. 20, 2021) …………………………………… 41

*Morse v. Fusto*,
  804 F.3d 538 (2d Cir. 2015) ………………………………………………………… 54

*Panetti v. Quarterman*,
  551 U.S. 930 (2007) …………………………………………………………………… 41

*Payne v. Tennessee*,
  501 U.S. 808 (1991) ……………………………………………………………....*passim*

*People v. Bynum*,
  70 N.Y.2d 858 (1987) ……………………………………………………………... 57

*People v. Covlin*,
  205 A.D.3d 578 (1ˢᵗ Dep't 2022) ……………………………………………………15, 37

*People v. Langford*,
  153 A.D.2d 908 (2d Dep't 1989) …………………………………………………… 48

*People v. Molineux*,
  168 N.Y. 264 (1901) ………………………………………………………………… 37

*People v. Weinstein*,
  42 N.Y.3d 439 (2024) ………………………………………………………………58, 59

*Pratt v. Greiner*,
  306 F.3d 1190 (2d Cir. 2002) ………………………………………………………42

*Romano v. Oklahoma*,
  512 U.S. 1 (2004) …………………………………………………………………... 47, 49

*Rompilla v. Beard*,
  545 U.S. 374 (2005) ……………………………………………………………..41

*Sistrunk v. Towns*,
  2024 WL 5156204 (S.D.N.Y. Dec. 18, 2024) ……………………………………….. 45

*United States v. LeMay*,
    260 F.3d 1018 (9th Cir. 2001) ………………………………………………...58

*United States v. Mensah*,
    110 F.4th 510 (2d Cir. 2024) ……………………………………………...49, 51

*United States v. Welshans*,
    892 F.3d 566 (3d Cir. 2018) ……………………………………………… 54

*United States v. White*,
    545 F. App'x 69 (2d Cir. 2013) ………………………………………….. 48, 50

*Whitley v. Ercole*,
    642 F.3d 278 (2d Cir. 2011) …………………………………………………45, 46

*Williams v. Artuz*,
    237 F.3d 147 (2d Cir. 2001) ………………………………………………… 41

*Woolcock v. People*,
    2012 WL 4344191 (E.D.N.Y. Sept. 21, 2012) ………………………………48, 51

## STATUTES

28 U.S.C. § 2242………………………………………………………………... 66

28 U.S.C. § 2244………………………………………………………………… 41, 42

28 U.S.C. § 2254…………………………………………………………… *passim*

N.Y. Crim. Proc. Law § 440.10………………………………………………38, 39, 42, 44

N.Y. Crim. Proc. Law § 470.05(2) …………………………………………………45

N.Y. Penal Law § 125.25…………………………………………………………….. 13

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VI………………………………………………………... *passim*

U.S. Const. amend. XIV…………………………………………………… *passim*

Petitioner Roderick Covlin, currently incarcerated at Sing Sing Correctional Facility in

Ossining, New York, respectfully petitions this Court for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  Petitioner seeks relief from a conviction obtained in violation of the Constitution

of the United States, specifically the Sixth and Fourteenth Amendments.

## <u>INTRODUCTION</u>

This petition challenges a conviction obtained through tactics that shredded Petitioner

Roderick Covlin's rights under the Sixth and Fourteenth Amendments to the U.S. Constitution.

On March 13, 2019, Mr. Covlin was unlawfully convicted in the Supreme Court of the State of

New York, New York County, of the December 31, 2009, death of his estranged wife, Shele

Danishefsky Covlin.  Mr. Covlin's conviction was based not on reliable evidence but on

distortion—a record tainted by prosecutorial misconduct, evidentiary manipulation, and

constitutional error.  The Constitution demands more.  When a conviction rests on deception,

when a jury is guided by invention rather than evidence, the verdict cannot stand.  Nevertheless,

Mr. Covlin's conviction was affirmed on direct appeal, and subsequent New York State post-

conviction relief was denied.  He is now serving a sentence of twenty-five years to life on his

conviction for Murder in the Second Degree.

Mr. Covlin's petition is based on at least five specific constitutional violations:

(a) pervasive prosecutorial misconduct in violation of due process under *Berger v. United States*,

295 U.S. 78 (1935); (b) the trial court's admission of misleading and false evidence important to

the prosecution's case in chief in violation of due process under *Donnelly v. DeChristoforo*, 416

U.S. 637 (1974); (c) the trial court's refusal to allow Mr. Covlin to cross-examine a witness

important to the people's case in chief in violation of his right to confrontation under *Crawford

v. Washington*, 541 U.S. 36 (2004); (d) the trial court's admission of propensity evidence in

violation of due process under *Payne v. Tennessee*, 501 U.S. 808 (1991); and (e) the People's

failure to preserve potentially exculpatory evidence in violation of due process under *Arizona v. Youngblood*, 488 U.S. 51 (1988). Despite presenting these claims in state court, Mr. Covlin was denied full and fair consideration of his constitutional rights. For this reason, this Court's intervention is necessary to prevent a continued fundamental miscarriage of justice.

## **BACKGROUND**

### I.    **Factual Background**

#### A.    **The Covlin's Marriage and Divorce**

Roderick and Shele Covlin, née Danishefsky, were married on September 7, 1998. Until shortly before Ms. Covlin's death, they lived together in Apartment 515 in an Upper West Side apartment building called "The Dorchester," located at 155 West 68th Street. At the relevant time in 2009, The Dorchester had a front lobby with a twenty-four-hour doorman and concierge as well as a back entrance that was staffed with another doorman from 7:30 a.m. until roughly 11:30 p.m. There was also a video surveillance system covering both of the building's entrances and the doors to the elevators that led to the lobby.

Mr. and Ms. Covlin had two children: Anna, born October 12, 2000, and Myles, born September 26, 2006. Shortly after Anna was born, the Covlins hired a nanny, Hyacinth ("Rose") Reid, who worked for them until Ms. Covlin's death in 2009, and Ms. Reid was subsequently paid by the Danishefsky family for at least one year after Ms. Covlin's death.

The Covlin's marriage began to deteriorate the summer of 2008 after Ms. Covlin suspected that Mr. Covlin had not been faithful in their marriage. In March 2009, she began preparing to file for divorce. When the couple first separated in April 2009, Mr. Covlin moved across the hall into Apartment 510 to stay near the children. Ms. Covlin's family owned Apartment 515. Mr. and Ms. Covlin both signed the lease to Apartment 510 as tenants.

Although their marriage was at times turbulent, there was not a single allegation of physical abuse at any time prior to their April 2009 separation and Mr. Covlin's move across the hall.

Ms. Covlin filed for divorce on May 11, 2009, and four days later, she filed an *ex parte* application resulting in (1) an order awarding her exclusive occupancy of Apartment 515 and custody of both children; and (2) a temporary order of protection prohibiting Mr. Covlin from having any contact with Ms. Covlin or their children. The same day Ms. Covlin filed that petition, she, her father, and her lawyer went with a locksmith to Apartment 515 and had the locks changed. According to the testimony of the children's nanny, Rose Reid, the new locks came with four keys: two were provided by the locksmith at installation, and two were made shortly after installation. Ms. Reid further testified as to who possessed each of the four keys: (1) herself (the nanny); (2) Ms. Covlin; (3) Ms. Covlin's mother; and (4) the front desk of The Dorchester.

On May 20, 2009, the temporary order of protection was modified to allow Mr. Covlin to have visitation with his children. However, in July 2009, it was modified again to only permit supervised visitation by a third party. On August 18, 2009, the order of protection was again modified to permit his visitation to be supervised by Mr. Covlin's father, David Covlin.

**B.    Ms. Covlin's Death**

On the evening of December 30, 2009, Mr. Covlin visited with his children in Apartment 510. His father, David, was present to supervise. At approximately 8:00 p.m., Ms. Reid came to retrieve the children to bring them back to Apartment 515. Thus, Mr. and Ms. Covlin, whose divorce was not yet final, were in their respective apartments across the hall from each other. In Apartment 515, Ms. Covlin logged on to her computer and accessed the internet around 9:31 p.m. She then visited the dating website, JDate, at 10:13 p.m. and conducted three internet searches. This was the end of Ms. Covlin's electronic trail. Similar electronic evidence showed

3

that Mr. Covlin spent much of the evening on his computer, chatting and playing the online

game, GridGammon, with his friend, Debra Oles, until 1:03 a.m. on December 31, 2009.

At around 4:13 a.m., The Dorchester's surveillance security video showed Mr. Covlin

leaving the building through the lobby.  According to testimony from the doorman, Mr. Covlin

asked the doorman if he wanted anything from Rite Aid, and the doorman requested a Snickers

candy bar.  At 4:16 a.m., while outside The Dorchester, Mr. Covlin texted Ms. Oles that he had

"[p]assed out" earlier.  Mr. Covlin went to Rite Aid and purchased two sodas and the Snickers

bar for the doorman, returning at about 4:23 a.m.  Mr. Covlin was then recorded leaving the

building again at around 5:02 a.m., this time through the back entrance where cameras are also

present.  He went back to Rite Aid and bought two bottles of seltzer, returning around 5:07 a.m.

At around 7:04 a.m., nine-year-old Anna found her mother unconscious in the bathtub

and called her father from the telephone landline in Apartment 515 and told him that something

was wrong with her mother.  Mr. Covlin came over from Apartment 510, and Anna had to let

him in to Apartment 515 by unlocking and unchaining the door, at which point he proceeded to

the bathroom, removed Ms. Covlin from the bathtub, called 911, and began to administer CPR.

Anna called the lobby of The Dorchester at 7:11 a.m. to inform the doorman that an ambulance

would be arriving for her mother.

At 7:18 a.m., four firefighters arrived at The Dorchester in response to the 911 call.

When they entered Apartment 515, they found Ms. Covlin lying on the bathroom floor.  One of

the firefighters noted that Ms. Covlin's body exhibited rigor mortis and concluded that no

resuscitative efforts were possible, as she was already deceased.  When paramedics arrived at

7:20 a.m., the firefighters let the paramedics take over and left the apartment.  Upon examining

Ms. Covlin, EMS responder, Bobby Wong, confirmed that rigor mortis had set in and declared

7:25 a.m. as the time of death.  NYPD Sergeant Noce and Officer O'Conner also arrived at 7:20 a.m. and proceeded to the apartment, followed shortly thereafter by Police Officers Irwin and Pagano.  Officer Irwin testified that he was with Mr. Covlin when he first arrived on the scene and watched Mr. Covlin sit down and put on a pair of socks.

Approximately two hours later, at 9:10 a.m., Detectives Roadarmel and Martin from the NYPD 20th Precinct Detective Squad arrived at The Dorchester and went to Apartment 515 where they took pictures of the bathroom.  Detective Roadarmel interviewed Mr. Covlin around 9:30 a.m. and later interviewed nine-year-old Anna.  The latter interview proceeded with Anna's grandfather, David Covlin, present after Mr. Covlin objected to his young daughter being interviewed alone.

Later that afternoon, at approximately 1:30 p.m., Detective Brown from the NYPD Crime Scene Unit arrived at Apartment 515 to conduct his own investigation.  He took photographs of the apartment's entrance (showing no forced entry), the hallways, the three bedrooms, and the two bathrooms.  He also took photos of Ms. Covlin's body on the bathroom floor, which showed no blood on her legs.  Detective Brown testified he learned from Anna that she found her mother in the bathtub and that her father removed Ms. Covlin's body from the tub and attempted resuscitation.  In Detective Brown's report, he wrote that it looked as if Ms. Covlin had fallen while holding onto the cabinet door that was above one of the ends of the bathtub because the cabinet was off its hinges.  Also, during his investigation, Detective Brown observed a watermark in the tub indicating a water level three inches higher.  He determined that the mark was the result of Ms. Covlin's body having been in the tub for sufficient time for the mark to have formed.

At around 2:17 p.m., Detective Brown took photographs of Ms. Covlin's bedroom and bed, looking for evidence of a struggle or violence or anything unusual in the bedroom. He found nothing. These photographs by Detective Brown were the *only* photographs of Ms. Covlin's bedroom taken on December 31, 2009. Further, the record contains no testimony that Detective Brown—or any other officer—found any traces of blood anywhere in the bedroom, including on the light-colored carpet. Detective Brown also found no blood, water spots, or stains on the bed or any blood anywhere in the apartment except for Ms. Covlin's bathroom where she was lying deceased. Consistent with the evidence, Detective Brown's report indicated that Ms. Covlin fell while holding onto the door of the cabinet above the tub, which was found open and partially off its hinges, and that her death was an accident.

As a result of the unanimous conclusion by all the NYPD officers and detectives on scene that Ms. Covlin's death was accidental, the officers did not remove any forensic evidence from the apartment on December 31, 2009. However, sometime that day, the police took The Dorchester's set of keys to Ms. Covlin's apartment and brought it to the 20th Precinct, where it was put in an envelope, sealed, and placed into a property locker.

At 6:46 p.m. that day, Ms. Covlin's body was removed from the apartment and brought to the Office of the Chief Medical Examiner (OCME). Dr. Jonathan Hayes is the forensic pathologist at OCME who was assigned to Ms. Covlin's body. Ms. Covlin's family objected to an autopsy on Orthodox Jewish religious grounds, so Dr. Hayes only conducted an external examination and took photographs of Ms. Covlin's body. Unlike the crime-scene photographs that showed no blood on her legs while inside her apartment, the photographs that were taken at the morgue showed blood droplets on her legs and on the ankle tags identifying her body. The prosecutor never asked Dr. Hayes to explain how blood got onto Ms. Covlin's legs and ankle

tags while she was in the morgue despite no blood being found on her legs at the crime scene. Although OCME has the authority to overrule a family's objection to an autopsy under suspicious circumstances, Dr. Hayes did no such thing and permitted her body to be buried without an autopsy. He indicated on her death certificate that the manner of death was "undetermined."

### C.     Subsequent Events

On January 1, 2010—one day after Ms. Covlin was found dead—the NYPD allowed Rabbi Meyer Weill to enter Apartment 515. Rabbi Weill had been notified of Ms. Covlin's death by the rabbi of her synagogue, and her rabbi requested Rabbi Weill collect Ms. Covlin's bodily fluids for the purpose of burying them with her body in accordance with Jewish law. After walking through the apartment to ensure there was no blood on the floors that would need to be collected and removed, Rabbi Weill scrubbed the bathtub and the bathroom floor with peroxide, even using Q-Tips (cotton swabs) to ensure a thorough scrub. He also removed the comforter, blanket, and bathmat that had been used to cover the deceased while she was lying on the bathroom floor and laid them out on her bed to examine them for blood. Rabbi Weill testified that if there had been any blood on any of those items, he would have cut out the bloodstained parts pursuant to Jewish law and removed them from the premises for burial with the body. He further testified that he found no blood. The police officer guarding the apartment remained outside the entire time Rabbi Weill was inside moving items around.

After Rabbi Weill left, three NYPD officers searched the apartment, moved various items around, and removed several things, including cash, jewelry, and a safe. As they left, the NYPD sealed the apartment by placing a green rectangular sticker on the door and its frame, prohibiting further entrance.

Not long after Ms. Covlin's death, her family—having changed their minds about an autopsy and having become dissatisfied with the lack of a police investigation—hired private investigator and former NYPD detective, Michael Swain, to gather information to assist the police in keeping the investigation open with the aim of gathering enough information to have Ms. Covlin's body exhumed to perform an autopsy.  Among the concerns expressed by the family to Mr. Swain were that the police did not (1) obtain fingerprints from Ms. Covlin's apartment; (2) conduct DNA testing of the crime scene and related evidence; (3) properly analyze Apartment 515's locks; or (4) look for surveillance equipment they falsely suspected had been used inside the apartment.

On January 10, 2010, Detective Roadarmel, the lead detective assigned, told Mr. Swain and the Danishefsky family that he would keep the police investigation open pending the results of the family's investigation.  One week later, Mr. Swain; Ms. Covlin's sister, brother-in-law, and brother; and a family attorney visited the 20th Precinct and persuaded a police officer to let them into Apartment 515 notwithstanding the seal.  The NYPD officer brought the key that had been previously retained by the NYPD on the date of Ms. Covlin's death.  When the aforementioned group arrived at the apartment, they all had difficulty opening its door.  Mr. Covlin, who was still living in Apartment 510, heard a commotion, stuck his head out of his apartment, and asked if they needed help.  Mr. Covlin opened the door.  He was able to do this not because he had possessed a key to the new locks and was familiar with them, but because he was familiar with the misaligned housing mechanism for the lock—unchanged after the new lock's installation in May 2009—remained from the many years that he lived in the apartment.  After opening the apartment using the key provided by the NYPD, Mr. Covlin returned to his apartment, and the others entered Apartment 515.  While inside, without any supervision by the

officer who stayed back in the living room, the Danishefsky family and their private investigator were permitted to walk freely throughout the apartment and touch, move, and even remove items from the scene. Indeed, in over 100 photos and an array of videos, the Danishefskys can be seen moving and removing various items from the scene. And in a recorded video later admitted into evidence at trial, Ms. Covlin's sister, Eve Karstaedt, noted that numerous items (including Ms. Covlin's laptop and prescription bottles) were in different locations than they were when she saw the apartment on December 31, 2009, indicating that someone had moved them and the scene had not been preserved. Ms. Karstaedt and Mr. Swain testified the family searched for Ms. Covlin's cell phone (including by calling it) but were unable to find it. According to the family, although they saw the charging cable for the phone in Ms. Covlin's bedroom, the phone was not attached to it.

On February 2, 2010, Ms. Covlin's father, Joel Danishefsky, as owner of Apartment 515, provided the police with an Order of Consent to search the apartment, which permitted the police to take any relevant evidence—despite the fact Rabbi Weill, the police, and the family had all previously already removed items from the apartment. On February 9, 2010, Detectives Roadarmel and Brennan went to the apartment, used the key that they had taken from the precinct's property locker, entered, and searched the apartment. At the Danishefsky's request, the NYPD specifically searched for Ms. Covlin's cell phone and laptop. They found the laptop but not the cell phone, though they claim that they did see the phone's charging cord on the floor next to a night table that was at one corner of Ms. Covlin's bed. Despite this claim, the detectives did not photograph the charging cord or the area next to the night table. In addition, because an unidentified individual told the detectives Mr. Covlin had expertise in surveillance and that there might be surveillance equipment in the apartment, Detective Brennan searched

inside the apartment's air vents.  He found nothing and, of even greater moment, stated that due

to the undisturbed nature of the dust in the ductwork, there never could have been any

surveillance equipment there in the first place.  At the end of the detectives' search of the

apartment, they removed Ms. Covlin's laptop, several bottles of prescription medicine, and an

empty vodka bottle.  No other forensic evidence was taken.

On March 1, 2010, pursuant to an Order of Exhumation, Ms. Covlin's body was exhumed

and taken to the Medical Examiner's Office where an autopsy was performed that same day.

Although Dr. Hayes found the drugs Furosemide, Meridia, and Xyzal in Ms. Covlin's blood, he

did not find any alcohol.  Nevertheless, he noted that the absence of alcohol could have been the

result of her body breaking down the alcohol (along with other drugs) in the two months since

Ms. Covlin's death.  DNA testing revealed that blood consisting only of Ms. Covlin's DNA was

found under the fingernails of her left hand.  Dr. Hayes' other findings included bruising and

scrapes on Ms. Covlin's right elbow as well as bruises to her right hand and wrist.  He did not

opine as to causation.  There were also abrasions on her face, chin, and lips.  Additionally,

Dr. Hayes noted subtle petechiae in Ms. Covlin's right eye, which he had failed to notice during

the external examination on January 1, 2010.  Notably, Dr. Hayes testified that he did not take

Ms. Covlin's medical history into consideration, including her prior diagnosis of osteoporosis,

contrary to widely accepted practice.[1]

---

[1] Under Standard B5.3 published by the National Association of Medical Examiners, a forensic
pathologist in rendering his or her opinion should "review[] the investigative reports, **medical
records**, medications (where applicable), and scene imagery that the forensic pathologist deems
relevant in his/her professional opinion." (*See* Forensic Autopsy Performance Standards,
National Association of Medical Examiners,
https://www.thename.org/assets/docs/2016%20NAME%20Forensic%20Autopsy%20Standards
%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.pdf (accessed September 14, 2025) (emphasis added)).  Thus, a medical examiner
is explicitly required to review prior medical history when forming opinions on cause and
manner of death.  Here, no such review took place.

The most significant discovery by Dr. Hayes was that Ms. Covlin's hyoid bone—a fairly delicate bone shaped like a small wishbone high in the neck—was broken on the right side. Because he noted that there was a hemorrhage, he opined that the injury occurred while Ms. Covlin still had a heartbeat. Based upon these injuries, Dr. Hayes concluded that Ms. Covlin died as a result of neck compression and reclassified her death as a homicide.

On or about April 8, 2010, the NYPD received official notification that the Medical Examiner had re-classified Ms. Covlin's death as a homicide. Coincidentally, by April 10, 2010, Mr. Covlin moved out of The Dorchester without being informed of the OCME's reclassification of Ms. Covlin's death.

Over seven weeks later, on June 2, 2010, at approximately 9:10 a.m., the police entered Ms. Covlin's apartment pursuant to a search warrant. But no warrant was actually required because the NYPD already had consent of the owner, and both the police and the Danishefsky family had repeatedly entered, removed, and rearranged various items. During the search, the police found the apartment in a different condition than they had left it on February 9, 2010. On June 2, 2010, because the lock to the apartment had now been glued shut, the police could not use the key to open the door and had the NYPD Emergency Services Unit use a battering ram to access the apartment.

The police videotaped their entrance to the apartment and immediately went to Ms. Covlin's bedroom in the back and looked behind the nightstand. Suspiciously, the videographer went directly to the back bedroom without a voice (or any other) prompt, indicating familiarity with the bedroom and what was "discovered" there—as if the videographer knew where to look for Ms. Covlin's cell phone. And uncoincidentally, the police instantly found Ms. Covlin's iPhone on the floor under one of her shoes next to a nightstand by her bed.

The iPhone was connected to its power cord plugged into an outlet in an area that had not been photographed previously.

As the police continued their search on June 2, 2010, they discovered that the air vent covers Detective Brennan had removed to search for alleged surveillance equipment on February 2, 2010, were now on the floor.  In addition, the bathroom cabinet door, which had been partially torn off its hinges, also was now fully off its hinges and on the floor in the bathroom, and a cosmetic bag was in the bathtub.  The cosmetic bag was one of the few items from which the police gathered forensic evidence.  Although male DNA was later found on the bag, the DNA was compared to Mr. Covlin's DNA and was determined not to be his.  No attempt was ever made to compare the DNA with anyone else to determine if there were other possible suspects.[2]  Finally, the police now found a Mezuzah on the floor and a ripped copy of an Order of Protection left on Ms. Covlin's bed.  All of these discoveries were not available to the police during their prior searches of the apartment, indicating a contaminated "crime" scene that could not be relied upon for its evidentiary value.

---

[2] The prosecution never disclosed this DNA profile to the defense, and when Mr. Covlin formally sought it in his CPL 440 motion to pursue critical familial DNA testing, the trial court flatly denied the request—undermining his fundamental right for a fair defense.

II.    **Procedural History**

After a six-year investigation,[3] Mr. Covlin was indicted on October 29, 2015, on an

entirely circumstantial case that substantially relied on prior bad act evidence.  In fact, even

former Manhattan District Attorney Cyrus Vance, Jr., questioned the strength of the case should

the People be barred from introducing the prior bad act evidence at trial, which led to the

resignation of the prosecutor initially assigned to this case.[4]

The indictment charged him with two counts of Murder in the Second Degree under

Penal Law §§ 125.25[1] and [3], respectively.  The first count was under the theory that he

intentionally caused the death of Ms. Covlin; the second was under the theory that he caused her

death in the course of and in furtherance of the crime of burglary.

A.    **The People's Prior Bad Act Evidence**

In March 2018 in advance of trial, the People filed a motion *in limine* to admit a vast

array of prior bad act and negative character evidence regarding Mr. Covlin.  The People's

motion consisted of two undated affirmations by the subsequently assigned Assistant District

Attorney Matthew Bogdanos that totaled 121 pages, which were later supplemented by a ninety-

---

[3] During the course of the six-year investigation, financial records the People obtained included an August 22, 2012, stipulation, which was entered in federal court, resolving litigation between Hartford Life Insurance Company and The United States Life Insurance Company in the City of New York (on the one side) and Philip Danishefsky, individually, and as Trustee of the Shele D. Covlin 2001 Trust, Mr. Covlin, Anna Covlin, and Myles Covlin (on the other).  The parties stipulated that Mr. Covlin would not be entitled to any benefits from the trust, which included discretionary payments to Mr. Covlin by the Trustee and quarterly trust income paid to Mr. Covlin until (a) the D.A.'s Office provided written confirmation that Mr. Covlin was not the subject of a criminal investigation regarding Ms. Covlin's death; or (b) six years passed since Ms. Covlin's death.  Notably, Mr. Covlin was arrested on November 2, 2015—less than two months before the stipulation expired.

[4] https://nypost.com/2015/11/30/vance-and-assistant-da-clash-over-wife-killer-case-so-she-resigned/

three-page Memorandum of Law on June 25, 2018.    Mr. Covlin served and filed opposition papers on July 16, 2018, and the People served and filed a Reply on July 30, 2018.

The prior bad act evidence that the People sought to introduce in their motion *in limine* was as diverse as it was plentiful.  Very little of it bore any apparent relevance to the issue of whether Mr. Covlin committed the crime he was charged with, and indeed, almost all of it was an attempt to assassinate Mr. Covlin's character to deny him a fair trial.  A significant proportion of the People's motion concerned things that Mr. Covlin allegedly did years *after* Ms. Covlin's death.  This evidence was also almost entirely hearsay.  Notably, however, in moving for its admission, the People requested that the trial court not address whether the alleged evidence would be admissible under an exception to the hearsay rule.  Instead, for purposes of deciding the motion, the People urged the court to assume the evidence was admissible and to postpone determining whether the evidence could be placed before the jury until after the court had decided the motion.  The court complied.  In this way, the People were able to convince the court, based almost entirely upon otherwise inadmissible hearsay, that Mr. Covlin's alleged "bad acts" established Ms. Covlin as a victim of domestic violence.  This, in turn—in addition to functioning as a predetermination of guilt—became the very basis for the court to admit the enormous amount of hearsay evidence of Mr. Covlin's alleged bad acts under a recently created

"background hearsay exception" for domestic violence homicides[5] (and convinced the court during the trial that the hearsay issue had previously been litigated).

The cavalcade of alleged prior bad acts that the People sought (and were eventually allowed by the court) to introduce can be divided into two categories: alleged acts *before* Ms. Covlin's death in December 2009, and alleged acts *after*. The first category included the following:

- Hearsay testimony that in April 2009, Mr. Covlin left a Passover trip with his family early to go to Las Vegas with a woman he was having an affair with. Mr. Covlin also was alleged to have flown into a rage and "thr[own] [Ms. Covlin] down on the floor" when he returned to the apartment and learned that Ms. Covlin had not yet unpacked his suitcase;

- Hearsay testimony that in May 2009, during a Mother's Day trip to the New York Botanical Gardens, Mr. Covlin became infuriated with Ms. Covlin and berated and called her names in front of their children and passersby because she had not given sufficient respect to his mother. Mr. Covlin also was alleged to have declared he would be moving back into Apartment 515 even though the couple had separated, and he had moved across the hall;

- Hearsay and double hearsay testimony that, according to Rose Reid, Ms. Covlin told Ms. Reid that Mr. Covlin said to Ms. Covlin two days after the alleged Botanical

---

[5] *See generally People v. Bierenbaum*, 301 A.D.2d 119 (1st Dept. 2002). This exception was created to explain either the victim's state of mind and/or the nature of the relationship. It should be noted that months before Mr. Covlin's trial commenced, New York's highest court held that exception to be invalid in *People v. Brooks*, 31 N.Y.3d 939, 941 (2018), holding that testimony recounting the victim's statement that the defendant had previously threatened her was double hearsay and not admissible, even if offered as background in a domestic violence prosecution: "Nor is there any blanket hearsay exception providing for use of such statements as 'background' in domestic violence prosecutions." *Id.* On direct appeal of this conviction, the Appellate Division, First Department, reinforced *Brooks* and held that "[t]o the extent the trial court instructed the jury to consider the hearsay for that purpose, the instruction was erroneous." *People v. Covlin*, 205 A.D.3d 578 (1st Dep't 2022).

Gardens incident that "if [Ms. Covlin] ever tried to take the kids . . . away from him[,] he's going to move [Ms. Covlin] permanently";

- Allegations in Ms. Covlin's May 2009 divorce papers that Mr. Covlin assaulted her in front of the nanny in the April 2009 incident referenced above;[6] generally acted unpredictably and abusively in the months following the filing of the divorce petition; and was generally profligate in his spending;

- Inconsistent hearsay testimony that Mr. Covlin secretly accessed Ms. Covlin's personal email and/or hacked her social media accounts;

- Purported testimony that Mr. Covlin coached Myles into making false sexual abuse allegations against Ms. Covlin;

- Evidence of Mr. Covlin's sexual promiscuity with numerous women,[7] which itself included hearsay evidence that Mr. Covlin said he wanted Ms. Covlin and/or her family dead;

- Testimony that Mr. Covlin was unhealthily obsessed with backgammon and that this caused strife in his marriage; and

- Hearsay testimony by different confidants of Ms. Covlin that she had said that Mr. Covlin was abusive, that he was following her, that she was afraid of him, that their marriage was toxic, and that Ms. Covlin was disgusted by Mr. Covlin's stated desire for an open marriage and his need for her financial support.

---

[6] This specific assertion was demonstrably false, as Ms. Reid testified at trial that she never witnessed such a thing.

[7] At trial, the People were allowed to bolster their plentiful evidence of Mr. Covlin's womanizing with demonstratives, one of which was a graph that purported to show that Mr. Covlin had illicitly contacted over a thousand women in 2009 and another of which was a pie chart that purported to show how much of Mr. Covlin's time he dedicated to pursuing women on the internet.

The allegations of prior bad acts committed by Mr. Covlin *after* Ms. Covlin's death were also extensive.  They included the following:

- Evidence (including, as with so many of these instances, hearsay testimony) that Mr. Covlin "stole" large sums of money from his children's 529 accounts, even though by definition those accounts are owned by the parent, who may use the funds as he chooses;

- Evidence that Mr. Covlin via his attorney (a former judge) submitted guardianship petitions in Westchester County's Surrogate Court containing falsified information to secure appointment as his children's guardian and gain access to Ms. Covlin's life insurance proceeds;

- Evidence Mr. Covlin verbally and emotionally abused other women with whom he was involved, not just Ms. Covlin;

- Evidence that Mr. Covlin applied for a lease under a false name for fear he would be denied due to the publicity of this case;

- Testimony that Mr. Covlin planned to get his mother fired from her job for being in contact with the Danishefsky family and having an argument with Mr. Covlin's then-girlfriend;

- Testimony that Mr. Covlin plotted on no fewer than four separate occasions to kill his own parents, despite no actual attempts being made, including by:

  - Murdering them at home during a hurricane-caused blackout and setting their house on fire;

  - Disguising himself as a black man and beating his mother to death on her front stoop when she answered the door for him;

  - Poisoning his parents with toxic compounds that he learned about on TV shows; and

       o  Inducing his daughter Anna to kill her grandparents with rat poison.

**B.**    **The Trial**

Mr. Covlin's jury trial began on January 22, 2019, and lasted fifty days.  The People's entirely circumstantial case consisted of more than seventy witnesses and over 650 exhibits.  Mr. Covlin did not call any witnesses.  Because the trial itself was extensive and the trial record voluminous, this petition sets forth only the key facts necessary to the specific claims for relief asserted herein.

**1.**    **The People's Opening Statement**

ADA Matthew Bogdanos delivered the People's opening statement on the morning of January 22, 2019.  In opening, the People argued that Mr. Covlin entered Apartment 515 using a key Ms. Covlin supposedly gave him—despite changing the locks and obtaining the order of protection—and killed her sometime between 1:13 and 4:13 a.m., as suggested by the time window of Mr. Covlin's online activity and the building's surveillance cameras.  The People asserted that several actions that Mr. Covlin took on the early morning in question—namely, his "unusual" interaction with the doorman as he was leaving the lobby the first time, his text message to Debra Oles that he had "passed out" previously, and his leaving the building second time through the back entrance—represented an attempt to set up an alibi.

However, the prosecution's three-hour window within which Ms. Covlin must have died was a fiction.  Evidence at trial showed that Ms. Covlin's last electronic trace was 10:13 p.m.  Furthermore, expert testimony indicated that although Ms. Covlin's body was already in rigor mortis prior to the police's arrival at 7:20 a.m. the next morning, the exact time it began was impossible to determine—only that at least three to six hours **<u>must</u>** have passed for rigor mortis to have developed.  Given that Ms. Covlin's accidental death could have occurred any time after

10:13 p.m., and the three-to-six-hour window could have started then, the prosecutor's insistence

that it was impossible for Ms. Covlin to have died more than six hours prior to her body's

discovery at 7:20 a.m. distorted the evidence.  More than that, if the prosecutor had not illicitly

compressed the window for Ms. Covlin's time of death from 1:13 to 4:13 a.m., he would have no

room for his argument that Mr. Covlin's trips to the store were attempts to establish an alibi.

Thus, ADA Bogdanos falsely conveyed evidence to suit his theory.

The prosecutor went on to theorize in his opening statement that Mr. Covlin killed

Ms. Covlin while she was in the bathtub and later staged her death to look like an accident.  The

prosecutor made no reference to any notion that Ms. Covlin was killed or attacked anywhere

other than the bathroom (such as the bedroom), nor to blood stains or wet spots on bedsheets, nor

to the idea that Mr. Covlin purchased seltzer water that morning to remove such stains.

### 2.    The Silent Prison Surveillance Video

A month prior to trial, ADA Bogdanos represented to the trial court and to defense

counsel that discovery was complete.  This proved to be a knowing misrepresentation: on

January 14, 2019, on the eve of jury selection, the People disclosed to the defense that they

possessed another piece of evidence, namely, a video clip from a prison surveillance camera,

which had video but no sound.  Specifically, and with several members of the press observing

from the gallery, ADA Bogdanos stated for the first time that about seven weeks earlier, on

November 21, 2018, his office had received a letter, dated November 10, 2018.  This letter

included a purported affidavit from an inmate in the Brooklyn House of Detention, where

Mr. Covlin was then housed by the New York City Department of Corrections ("DOC") prior to

trial.  At the time the letter was written, that inmate was about to go to trial for his own second-

degree murder case, which ultimately resulted in his conviction and a sentence of twenty-five

years to life.

19

In these documents that the People had possessed for seven weeks, the inmate alleged Mr. Covlin confessed to him that he had killed Ms. Covlin with a choke hold and that Mr. Covlin demonstrated said manner of death while they were speaking at the Brooklyn House of Detention law library—an interaction that would have been captured on the library's surveillance cameras. According to the inmate, this confession had allegedly been made between 7:00 and 11:00 a.m. on either November 9 or 10, 2018. ADA Bogdanos obtained the video on January 4, 2019, at which time the inmate was no longer represented by counsel, having completed his trial and been convicted. The ADA claimed he met with the inmate the same day he obtained the video and that when they met, the inmate confirmed the allegations of his affidavit.

Of the approximately ten hours of prison surveillance video that it obtained, the District Attorney's Office extracted a one-minute, twenty-two-second, silent video clip, which was eventually admitted as People's Exhibit 438A. The clip appeared to show Mr. Covlin standing at a table in the back of the law library speaking with a seated inmate. A number of other inmates were in proximity to them, some seated at other tables and others milling about the room. As Mr. Covlin talked to the inmate in the video, he appeared to write something on a piece of paper on the table and then made a series of gestures with both of his arms.

The People refused to inform the defense or the trial court of the inmate's identity, citing concerns about the inmate's safety.[8] Presumably for the same reason, the People provided only redacted copies of the documents they claimed to have received, concealing the name of the inmate, his alleged signatures, the name of the notary, and the notary stamp. The ADA's stated concern about the inmate's safety was not explained or in any way elaborated upon, and certain facts—*i.e.*, that Mr. Covlin already knew who the inmate was, that the inmate was clearly visible

---

[8] The defense was able to determine the other inmate's identity based on its own investigation.

in the recording played in open court, and that the recording was eventually released to the media and the internet—make clear that the People's concern was not a sincere one. The trial court, in any case, never saw the unredacted documents. Indeed, the documents that were the basis for the admission of the prison surveillance video have never been reviewed by anyone other than the People even to this day.[9]

ADA Bogdanos stated he would seek to admit the silent video through a witness from the Department of Corrections, who would lay its foundation. The ADA also claimed, based on the theory that Mr. Covlin was a martial arts expert, that the video was relevant and admissible because (a) Dr. Hayes (the medical examiner) would testify that Mr. Covlin's movements in the video were consistent with a choke hold and that such a choke hold was consistent with Dr. Hayes' autopsy finding that the cause of Ms. Covlin's death was neck compression; and (b) the People's martial arts expert would confirm that Mr. Covlin was properly performing the choke hold he demonstrated in the video and that the hold was taught in martial arts. Indeed, Mr. Covlin's purported gestures in the video do not actually conform fully to either witness' description of the choke hold during their respective testimony.

In response, the defense's position was that the People's DOC witness could not give the jury sufficient context for the video to be able to evaluate it without speculation and that a proper foundation could not be laid without the fellow inmate. This is because the video was silent, and the DOC witness lacked personal knowledge of the interaction depicted therein. Without the

---

[9] On December 23, 2019, Mr. Covlin's appellate counsel filed a motion in the Appellate Division, First Department, to compel the People to file unredacted versions of the documents with the appellate court. The People represented in their opposition brief that the trial court never reviewed the unredacted documents (again, to protect the inmate's safety), and the First Department denied the motion, thus establishing that those documents were outside the record for the purpose of the direct appeal.

fellow inmate, the jury would rampantly speculate as to the interaction and what Mr. Covlin was saying.  Thus, the DOC witness could not lay a proper foundation for the introduction of the video.  Further, the defense asserted that since the People had known of the video weeks earlier, their intentional failure to inform the defense of its existence until the eve of trial constituted prosecution by ambush and denied Mr. Covlin a fair trial.  Lastly, the defense contended that prosecutors disclosed their choke hold theory in the immediate days before the silent surveillance video was taken.  That timing, the defense argued, made the footage meaningless—since it could just as easily show Mr. Covlin mimicking the People's narrative as opposed to revealing the truth of what occurred.  This is why the context of the conversation with the fellow inmate mattered and why, without it, Mr. Covlin's constitutional rights were destroyed.  Armed with this improperly admitted video, the People were able to argue his gestures were a demonstration and a confession.  The defense registered these objections in a letter to the court, dated January 17, 2019.

The parties appeared before the court to further litigate this issue during trial on February 25 and 26, 2019.  There, the ADA reported for the first time that the inmate refused to testify. Nevertheless, ADA Bogdanos claimed that even without the inmate's testimony, the video should be admitted because the inmate's affidavit was reliable as to the video's contents.  The ADA based his argument for the affidavit's reliability in it containing several allegations as to which the People had no prior knowledge.

Defense counsel renewed its prior objections to the video's admission, while also informing the court that many of the ADA's representations as to the reliability of the inmate's hearsay statements in his affidavit were false.  Notably, defense counsel advised the court that the defense's investigator had interviewed the inmate, who repudiated the allegations made in his

letter and affidavit and explicitly stated he did not properly execute the affidavit.  In fact, the inmate stated specifically that he made false allegations against Mr. Covlin because the inmate mistakenly thought that Mr. Covlin was acting as an informant against him.  The inmate also stated he regretted sending the documents to the District Attorney and reiterated he would not testify.  Defense counsel thus argued that a foundation for the video could not be laid.  Alternatively, defense counsel requested that the court hold a hearing at which the inmate could testify so that evidence in admissible form could be obtained.  Defense counsel suggested that the People could subpoena the inmate, and if he still refused to testify, force him to do so by giving him immunity.  Further, the defense argued that if the video were to be admitted, the only way to preserve Mr. Covlin's Sixth Amendment right to confrontation would be for the inmate to testify.

The People maintained, without any citation to authority, that there was no need to cross-examine the inmate because Mr. Covlin's Sixth Amendment rights would be satisfied if he could cross-examine the medical examiner, the martial arts expert, and DOC witness—even though *none of them had any actual knowledge of what transpired in the video*.  On these grounds, the ADA refused to subpoena the inmate and also refused to call the notary whom he had alleged had notarized the inmate's redacted signature.  The danger, of course, was that the People would insinuate to the jury that the silent video constituted a confession for which the defense would be unable to cross-examine any witness.

Absent any evidence on which the authenticity of the redacted letter or the redacted affidavit could be determined, those documents were not admitted into evidence.  Even so, based on nothing more than these unauthenticated documents and unverified hearsay representations, the People urged the trial court to admit the video into evidence and play it before the jury.

Defense counsel again objected, contending that without the inmate's testimony, the video could neither be authenticated nor given a proper foundation that would eliminate the otherwise inevitable tendency by the jury to speculate as to what they were watching.  This, defense counsel argued, would obliterate Mr. Covlin's right to due process and his right to confront his accusers.

The trial court, after viewing the silent video and relying solely upon the redacted documents and the ADA's hearsay representations about them, overruled defense counsel's many objections and granted the People's request to admit the silent video into evidence through the DOC witness.  The court cited no legal authority in doing so.  The court also effectively shifted the burden to the defense by suggesting that Mr. Covlin could subpoena the inmate himself to testify, despite the fact the defense had no obligation to do so.

Later, during the trial, the video was admitted into evidence through the testimony of a DOC employee who downloaded the video of the prison law library that the District Attorney's Office had requested.  Surely enough, the defense's concern came to fruition when the People argued that the interaction in the silent video amounted to a confession.  The People showed this video to the jury multiple times to bolster their argument that Mr. Covlin's gestures constituted a confession.

### 3.    Evidence of Ms. Covlin's Osteoporosis

During the multi-year investigation and subsequent discovery provided by the People, Ms. Covlin's medical records showed that in July 2009 she was referred to and treated by Dr. Linda A. Russell, a Rheumatologist specializing in metabolic bone disease and osteoporosis. Dr. Russell's notes from a July 16, 2009, initial evaluation of Ms. Covlin (five months prior to her death) diagnosed her with "borderline osteoporosis in the hips and osteopenia in the spine" and laboratory testing suggested "significant ongoing bone loss."

However, although the People possessed these medical records indicating Ms. Covlin's osteoporosis diagnosis and significant ongoing bone loss, ADA Bogdanos chose to mislead the jury into thinking she suffered from no such condition. During the prosecutor's direct examination of Dr. Bradley Adams, a forensic anthropologist, he asked Dr. Adams, "Did you find any evidence of osteoporosis in these bones?" and "Any evidence of the bones, themselves, being particular brittle?" (*Tr.* 3397:8–9, 12–13). Dr. Adams testified that as an anthropologist, he did not have a test for osteoporosis but opined that her bones seemed normal and not brittle. (*Tr.* 3397:10–11).

This testimony was particularly deceiving because the prosecutor elicited the testimony on direct examination but intentionally failed to present Dr. Russell's records to Dr. Adams for review. Dr. Adams' testimony on cross-examination confirms ADA Bogdanos' deception because Dr. Adams stated he did not review Ms. Covlin's medical records and was unaware of her bone density tests or osteoporosis diagnosis. (*Tr.* 3401:3–24). Here, the prosecutor knew Ms. Covlin's medical history. Yet he manipulated Dr. Adams on direct examination to paint a false picture of her condition—and then hid behind the excuse that the doctor had never reviewed her records. The result was a jury convinced that Ms. Covlin had not been diagnosed with osteoporosis. Central to the trial was whether Ms. Covlin's death was a homicide or an accident due, in part, to Ms. Covlin's bone loss. Thus, whether Ms. Covlin suffered from osteoporosis is relevant to determine the nature of her death, which both Drs. Adams and Hayes testified they did not review said records. ADA Bogdanos' deception effectively removed from the jury's consideration the role of Ms. Covlin's osteoporosis in her death.

### 4.    The People's Summation

ADA Bogdanos began delivering the People's summation on March 11, 2019, and continued into the following day.

A little over a third of the way into the six-hour summation, the ADA displayed several screenshots of The Dorchester lobby camera footage from December 31, 2009, in front of the jury. Based on those slides, but without relying upon any actual evidence, the ADA intimated that at those moments, Mr. Covlin was trying to create an alibi by walking through the lobby, asking the doorman if he wanted a Snickers bar and giving him one when he returned a few minutes later. The reason he did this, the ADA asserted, was that Mr. Covlin—whom the ADA had otherwise characterized as "very tech savvy"—was not aware that there were surveillance cameras in the building.[10] (*Tr.* 28:4). The prosecutor bolstered this claim by inventing testimony, falsely claiming that Mr. Covlin's sister-in-law, Eve Karstaedt, had testified that she was unaware of cameras while living in the building previously, when in fact she admitted she knew the cameras were there.

Then, in an attempt to argue that Mr. Covlin had already killed Ms. Covlin, the ADA showed the jury two slides depicting Mr. Covlin standing next to the front desk of the lobby around 4:14 a.m. and urged the jury that they "should not speculate why he was holding his left arm" in the way that he was and stated that the jurors would "never know why he is holding his left arm just so, on that jacket." (*Tr.* 4567:13-16). Despite the lack of any evidence, the ADA did this to imply that Mr. Covlin was hiding something in his jacket as he left the building. A few moments later, ADA Bogdanos showed the jury a photograph of Mr. Covlin as he walked out the back entrance of the building for the second time at 5:02 a.m., and asked: "Why are his arms not hanging freely at his sides? What's wrong with his neck? Working out that crook in the neck, are you?" (*Tr.* 4569:7-8). This second statement was another attempt—without

---

[10] This argument collapses in light of evidence that Mr. Covlin lived in The Dorchester for over ten years before Ms. Covlin's death, with surveillance cameras plainly visible throughout.

corroboration—to lead the jury infer that Mr. Covlin was hiding something and had hurt himself while choking Ms. Covlin.  After putting up an image of Mr. Covlin walking outside a few seconds later, the ADA said:

> Still, those arms not hanging freely, and you know, it could just be me or it could be shadows, it could be the angle.  God, it's like he gained a little weight.  I know the camera puts on a few pounds but it sure looks like in this angle—and you will look at that video, won't you—but it sure looks like this angle, he gained a little weight.

(*Tr.* 4569:14-20).  This again, was unsupported by evidence and led the jury to speculate that Mr. Covlin had been hiding something.  Then, upon showing the jury images of Mr. Covlin reentering the building about five minutes later, the ADA remarked: "Now he's looking good. Now he's looking nice and trim.  Now that arm is swinging free."  (*Tr.* 4569:21-22).

A few minutes later, ADA Bogdanos began to enumerate what he referred to as "clues . . . left behind" by Mr. Covlin.  (*Tr.* 4583:10).  The first of these was falsely asserting Ms. Covlin's time of death, which, based on the degree of rigor mortis apparent when she was found, would have been between 1:25 a.m. and 4:25 a.m.  In actuality, her time of death could have been any time after 10:13 p.m. the night before, and only means it was *more than* three to six hours prior to her body being found with rigor mortis already set in.  It does not mean that the only window for her time of death was three to six hours before her body was found—meaning 1:25 to 4:25 a.m.  The window for her time of death was 10:13 p.m. to 4:25 a.m.—contrary to what ADA Bogdanos asserted.

Next, and most notably, the prosecutor compounded his wrongdoing by intentionally misrepresenting the time a series of photographs were taken.  At trial, the People admitted into evidence four photographs of the bedroom taken on December 31, 2009: People's Exhibits 260, 261, 262, and 263, all of which were taken by Detective Brown at 2:17 or 2:18 p.m. on December 31, 2009.  Indeed, the evidence produced throughout discovery and admitted at trial

made clear that Detective Brown took no photographs of Ms. Covlin's apartment in the morning because he only arrived at the apartment that afternoon. Further, he testified that at the time he photographed Ms. Covlin's bed that afternoon, he did not observe a wet stain, blood, or anything else that appeared suspicious. (*Tr.* 2293:9–2294:24).

Yet, despite this unmistakable and incontrovertible evidence, the prosecutor misrepresented to the jury that these photos were taken ***in the morning*** when the NYPD first arrived at Ms. Covlin's apartment, almost seven hours earlier than Detective Brown photographed the scene. (*Tr.* 4585:3–4). The reason the prosecutor deliberately misstated the time these photos were taken is that a photo of the bed from that morning was the only way to justify his new theory to the jury. Put differently, the photo is the only link to the prosecution's theory in summation (a theory not previously espoused) that Mr. Covlin attacked Ms. Covlin in her bed causing a blood stain and that the bed was wet from Mr. Covlin purportedly cleaning off the blood with seltzer. Because of this, the prosecution needed the jury to believe the photo was taken in the morning. Indeed, without this intentional misrepresentation, the prosecutor's new theory made no sense.

ADA Bogdanos then went further and directed the jury's attention to the first photograph (*i.e.*, the one that was taken the afternoon after Ms. Covlin's body was found) and stated: "Let's start normal. You know, this photo, this is a photo taken December 31st ***in the morning***; right, 2009." (*Tr.* 4583:15-17 (emphasis added)).



However, again, this was a straightforward misrepresentation because the People's own

evidence had established that the photo was taken in the afternoon by Detective Brown, who did

not even arrive at the apartment until 1:30 p.m.  There were no photographs taken of the

bedroom in the morning.  The ADA continued: "Let's blow it up, please.  Let's keep blowing it

up.  Let's keep blowing it up.  Now Stop."  (*Tr.* 4583:18-19).  At this point, the ADA jumped to

a different slide:



With this slide displayed to the jury, the prosecutor stated,

> What is that?  What's that wet stain?  You look at other photos you
> will see, ***much later, it's dry***.  What is that wet stain?  Why is it wet
> right here on the bed?  Next.  You have that photo, blow it up.  Don't
> take my word for it.  Look for the wet stain right on the bed.

(*Tr.* 4583:21-4584:1).

ADA Bogdanos fabricated a narrative—falsely claiming the above photo was taken that morning and purportedly illustrated a wet spot on the bed—leaving the jury with an untrue impression that became a central pillar of the People's theory: that Mr. Covlin had attacked Ms. Covlin in the bedroom and then tried to wash away the evidence with seltzer causing a wet spot. The prosecutor made this argument despite the testimony from every police officer who responded to the apartment that morning that none of them observed any wet spots on the bed.[11] From the alleged "wet spot," the prosecutor argued that: (a) Mr. Covlin attacked Ms. Covlin in her bed; (b) a violent struggle ensued in the bedroom; (c) blood spots were left on the sheet to her bed; (d) Mr. Covlin tried to clean the blood spots on the sheet using seltzer; (e) wet spots on the bed and sheet formed as a result of Mr. Covlin cleaning the blood; (f) Mr. Covlin staged the scene in the bathroom to make it appear as if Ms. Covlin's death was an accident; and (g) Ms. Covlin was never in the bathtub.  Most notably, ADA Bogdanos did not misspeak about the time the photo was taken—he doubled down.  First, he said the photo was taken in the morning.  Then he added, "[Y]ou will see, much later, it's dry."  (Tr. 4583:22)  His entire theory hinged on that

---

[11] In addressing the inconsistency between the police testimony and the prosecutor's new theory, the prosecutor also testified as an unsworn witness when he said, "So I respectfully submit once you see that she bled, once you see the wet spot on the bed then the police arrived that morning—and yeah, they missed it, I get it."  (Tr. 4585:2–5).

wet spot being there in the morning—and of course the defense was never given an opportunity to respond to these untruthful comments during the prosecutor's summation.[12]

The ADA's deception went even further when he showed the jury two photographs of Ms. Covlin's face: one taken in her bathroom on the morning of December 31 and the other taken at the morgue. The photographs showed blood on the left side of Ms. Covlin's upper lip and cheeks, and the ADA told the jury that she took a "shot" to her mouth and nose, stating that "we know that she bled, that's clear. The question is where did she bleed? Where did the attack begin?" (*Tr.* 4584:13, 17-18). He answered his own question by asserting that after Mr. Covlin left his apartment and bought two two-liter seltzer bottles around 5:07 a.m., he somehow reentered Apartment 515 and cleaned the blood off the bed sheet with the seltzer. This claim was not supported by evidence—only this unsworn testimony provided by ADA Bogdanos himself: "What is seltzer good for? I grew up in my family's Greek restaurant, and I can't remember how old I was when my mother told me the way to get red wine out is seltzer. I was probably 12 or 13." (*Tr.* 4585:9-12).

The ADA continued his unsworn testimony by telling the jury, without any supporting evidence (and, in fact, contrary to the evidence including the rabbi's testimony), that there was also blood on the comforter and the blanket. He fabricated a story that Mr. Covlin draped these items over Ms. Covlin's body to make bedroom blood look like it had transferred in the bathroom. He then finished with a rhetorical flourish, sarcastically commending Mr. Covlin for executing a "pretty good forensic countermeasure." (*Tr.* 4586:2).

---

[12] During their deliberations, the jury sent the court a note that asked that they be provided with the "Photo of master bedroom fitted sheet (rip/wet stain) introduced in Summations"—demonstrating the significance of these misrepresentations and fabrications. (Tr. 4684:6-7).

To prop up the People's bedroom-attack theory, the ADA deliberately misled the jury—inventing that Mr. Covlin forced only her face into the tub, directly contradicting the original claim that her whole body was placed there and trial testimony from the People's witnesses. He based this false claim on two photographs of Ms. Covlin's legs taken by the Medical Examiner at the morgue after her death, which appeared to show blood droplets on her legs. ADA Bogdanos claimed that the blood had dripped from Ms. Covlin's face only onto her legs but not anywhere else after Mr. Covlin had hit her in the face as he dragged her from the bedroom to the bathroom, despite not finding any blood trail between the rooms. He argued that if Ms. Covlin's entire body had been in the tub, she would not have had any blood on her legs. Based on an unsupported claim that Ms. Covlin bled from a facial strike and the blood miraculously only went onto her legs and nowhere else on her body, the ADA misled the jury, asserting she was never in the tub, to bolster his fabricated theory that she was attacked on the bed and dragged to the bathroom by a choke hold. He argued this despite that it was contrary to the evidence he had presented. Because all of this was first introduced in the People's summation, the defense did not have the chance to show that photos taken at the apartment—*after* Ms. Covlin's death but *before* transport to the morgue—which showed no blood droplets on her legs, conclusively proved they appeared later at the morgue, not in the bathroom as the prosecutor misleadingly suggested. The photos are reproduced below to demonstrate the glaring fabrications presented to the jury, namely, that the blood droplets at the morgue were not present when she was found dead in the bathroom[13]:

---

[13] The red circles and numbers have been added to these exhibits for illustrative purposes.
Number 1 = top of right foot
Number 2 = left leg above the ankle
Number 3 = top of left foot



*Photo 1 from Medical Examiner's Office on December 31, 2009*



*Photo 2 from Medical Examiner's Office on December 31, 2009*



*Photo 1 taken in bathroom on December 31, 2009*



*Photo 2 taken in bathroom on December 31, 2009*

The above photos demonstrate that the prosecutor misleadingly used photos from the morgue with blood spots on her feet and legs—which are contradicted by photos from the bathroom in which Ms. Covlin was found deceased—to argue that the blood spatter shows that Ms. Covlin must have been attacked by Mr. Covlin. Yet this argument is belied by the evidence from the date of Ms. Covlin's death that there was no blood on her legs. The prosecutor repeatedly used these blood drops from the morgue to argue that there could not have been blood drops on her legs if she was ever in the tub. (Tr. 4592:14–21). Further, this argument defies logic as, according to the prosecutor, blood only ended up on the front of her legs but not the carpet, walls, clothing, or bed.

After posing the above-referenced questions, the prosecutor improperly continued:

> Look at all these blood drops. Now we are up on the thigh. These are blood drops from the face. Those are blood drops. Where did they come from? Why weren't they washed away in the water? Look, these are drops. They aren't smears. It is not a reddish her to

35

her foot.  Drop, drop, drop, drop, drop.

(Tr. 4586:25–4587:7).[14]

Near the end of his summation, ADA Bogdanos told the jury that to believe Mr. Covlin's defense required the contemporaneous belief that all the People's witnesses were liars.  The ADA was not equivocal on this point, going so far as to use visual aids to underscore his characterization of the defense:



In total, ADA Bogdanos showed the jury fifty separate slides asserting that the jury had to believe various prosecution witnesses were liars in order to acquit Mr. Covlin.  Shortly thereafter, and relatedly, the ADA vouched for his own integrity by telling the jury that if any prosecutor told a witness what to say—which, to be clear, defense counsel had never claimed he did—that prosecutor should be fired.  He underscored the point by telling the jury, "We work for you, right, we work for you," implying that the prosecution and the jury were on the same side against the defense.  (*Tr.* 4629:24–25).

---

[14] To make matters worse, after the jury was shown both the false "wet spot" photograph and the misrepresented photo of Ms. Covlin with blood spatter from the OCME, the court broke for the day, leaving a lasting, indelible impression of the prosecutor's deceit with the jury.

The jury, after sending a very telling note about the importance of the "wet spot" photo, subsequently convicted Mr. Covlin of Murder in the Second Degree on March 13, 2019. Thereafter, the court sentenced Mr. Covlin to a term of twenty-five years to life imprisonment.

### C.     Post-Conviction Proceedings

Mr. Covlin timely filed an appeal of his conviction, raising various points of error, which are also relevant to this petition, namely, that (1) the pervasive and wide-ranging misconduct of ADA Bogdanos violated Mr. Covlin's due process rights; (2) the trial court's admission of a voluminous amount of prejudicial and irrelevant character evidence under *People v. Molineux*, 168 N.Y. 264 (1901), was improper; and (3) the trial court's admission of the unauthenticated silent prison surveillance video violated Mr. Covlin's Sixth Amendment confrontation and due process rights, among others.  The People filed a brief in opposition on December 15, 2021, and Mr. Covlin filed a reply in further support on February 9, 2022.

In a decision dated May 24, 2022, the Appellate Division, First Department, affirmed Mr. Covlin's conviction.  *See, People v. Covlin*, 205 A.D.3d 578 (1st Dep't 2022).  On the prior bad act evidence issues, the First Department held as follows:

> Evidence of defendant's extramarital affairs and assault on his wife provided context for the separated couple's marital strife and generally supported an inference that defendant would expect to be disinherited in his wife's will soon, providing a motive to kill her before she could do so.  Evidence of defendant's obsession with the game of backgammon was relevant to his motive of obtaining enough money to continue his lifestyle of playing backgammon without earning an income.  Defendant's plans, after his wife's death, to kill his own parents, and his statement to his girlfriend that the only people he wanted to kill were those who tried to take his children away from him (implicitly referring to his parents), supported the People's theory that part of defendant's motive was to prevent anyone from depriving him of access to the money his children would inherit from the victim.  Evidence that defendant used large amounts of money from his children's funds for his own personal purposes was probative of his motive to control such funds. The trial court providently exercised its discretion in admitting all

of this evidence, and the remaining bad acts evidence challenged on
appeal as more probative than prejudicial.

*Id*. at 580.  The First Department also held (without elaboration) that "[d]efense counsel opened the door to a witness's testimony about defendant's uncharged bad acts against her."  *Id*. at 579.  Further, the court explained that any prejudice arising from the admission of such evidence was generally "minimized by the court's limiting instructions," though the court did admonish the trial court that it "should not have instructed the jury to consider the victim's oral statements about defendant's possession of a key to her apartment as 'background information about the marriage.'  There is no blanket hearsay exception for background information about a marriage that is received, or only relevant, for its truth."  *Id*. at 580.

As regards the other claims on appeal, the First Department held that

> [d]efendant's challenges to a silent surveillance video of defendant, while incarcerated, allegedly demonstrating a chokehold in front of another inmate, to the prosecutor's summation, to certain questions posed to the domestic violence expert, and to the presentence report are unpreserved, waived, or unreviewable, and we decline to review them in the interest of justice.  As an alternative holding, we find no basis for reversal or a new sentencing proceeding.  In particular, we find meritless defendant's arguments about a purported change in the prosecutor's theory.

*Id*. at 581.

Mr. Covlin sought discretionary review by the Court of Appeals, which denied his petition without an opinion on August 31, 2022.

On June 26, 2023, Mr. Covlin sought post-conviction relief in the trial court via a motion to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10.  A little over a year later, the People filed their opposition to Mr. Covlin's Section 440.10 motion on June 29, 2024.  Mr. Covlin filed his reply in further support on August 30, 2024.

The trial court issued an opinion and order denying Mr. Covlin's Section 440.10 motion on January 24, 2025 (hereafter "Court Op.")  Even as the court acknowledged that "this was an entirely circumstantial case," the court nevertheless found that "there was overwhelming evidence of guilt and that the proof of guilt came from fair inferences that the jury properly drew from the trial facts."  Mr. Covlin's claim as to the prison surveillance video, the court held, was "without merit.  The custodian of the video apparatus at the Department of Corrections testified at trial and authenticated the video.  There was no audio.  The jury just watched the actions of the two individuals depicted in the video."  Court Op. ¶ 14.  The court also found that "[t]he fact that the other individual in the video did not testify is irrelevant.  The People are free to present their case as they see fit."  *Id*.

Although the First Department did not reach the merits of Mr. Covlin's prosecutorial misconduct claim, the trial court, in adjudicating Mr. Covlin's motion to vacate his conviction, did reach the merits in several respects.  First, the court "did not find any intentional misrepresentation of a material fact by the People."  *Id*. ¶ 9.  Second, the court found it significant, if not dispositive, that the People had "specifically [told] the jury that they must rely on the evidence, ' . . . when we are here, talking about whether or not the People have proven beyond a reasonable doubt, the defendant's guilt, it's the evidence, and what you may reasonably infer from the evidence that you must rely on.'"  *Id*.  Third, the court found Mr. Covlin's argument regarding the blown-up photo of the bed "disingenuous" because defense counsel knew that photo "at the time to be an enlargement of a photograph already in evidence"—despite undersigned defense counsel submitting an affidavit that the defense was not in fact aware.  *Id*.  Fourth, the court noted that defense counsel did not object to the photo at the time it was published to the jury, nor to when ADA Bogdanos asked to have the photo enlarged during

summation, nor when the proceedings ended for the day, nor the following morning before the

People resumed their summation.  *Id*.  (In this regard, the court observed that the

contemporaneous "'objection' defense counsel cites to in his 440 motion . . . refers to the

People's comments about the 'wet stain' and the 'blood spots'—not the publication of the photo

itself."  *Id*. ¶ 10.))  Fifth, the court was forced to acknowledge that "the prosecutor concedes that

he misspoke and stated that the photograph of [Ms. Covlin's] bed had been taken the morning of

the murder, rather than in the afternoon," but determined that the prosecutor's mistake did "not

rise to the level of intentionally misleading the jury, particularly given the complex nature of this

case and the voluminous amount of evidence involved."  *Id*.  Lastly, the court held that

ADA Bogdanos' remarks in summation "were all proper arguments by the People and fair

comments based upon the evidence at trial" and that "after reviewing the prosecutor's

summation in its entirety," the court concluded that "there were no comments so pervasive or

egregious as to deprive defendant of a fair trial."  *Id*.

## STANDARDS OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") federal courts

"shall entertain an application for a writ of habeas corpus in behalf of a person in custody

pursuant to the judgment of a State court only on the ground that he is in custody in violation of

the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Furthermore, a

court may not issue a writ of habeas corpus:

> with respect to any claim . . . adjudicated on the merits in State court
> proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See, e.g.*, *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When …

§ 2254(d)(1) is satisfied . . . [a] federal court must then resolve the claim without the deference

AEDPA otherwise requires.").  In addition, where a federal court addresses a claim or element

not addressed on the merits in the state proceedings, that claim or element is reviewed *de novo*.

*See Cone v. Bell*, 556 U.S. 449, 472 (2009) (holding Section 2254(d) inapplicable where "the

[state] courts did not reach the merits" of the particular claim); *Rompilla v. Beard*, 545 U.S. 374,

390 (2005) (reviewing *de novo* a constitutional claim for which the state court did not resolve the

issue on the merits).

     However, a court may not grant a habeas petition unless three threshold procedural issues

are resolved.  First, the submission of the application must be timely, satisfying a "1-year period

of limitation . . . by a person in custody pursuant to the judgment of a State court."  28 U.S.C.

§ 2244(d)(1).  In cases that do not involve a state-imposed impediment to seeking relief, a newly

recognized constitutional right, or a newly discovered factual predicate, the limitations period

runs from "the date on which the judgment became final by the conclusion of direct review or

the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(D).

     "A petitioner's conviction becomes 'final' under AEDPA 'after the denial of certiorari or

the expiration of time for seeking certiorari.'"  *Clemente v. Lee*, 72 F.4th 466, 476 (2d Cir. 2023)

(quoting *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001)); *see also Dillon v. Conway*, 642

F.3d 358, 360 n.3 (2d Cir. 2011) (judgment becomes "final" under AEDPA "upon expiration of

the ninety-day period to petition for a writ of certiorari to the United States Supreme Court");

*Moise v. Fields*, 2021 WL 5316133, at *4 (S.D.N.Y. Sept. 20, 2021), *report and

recommendation adopted*, 2021 WL 6133992 (S.D.N.Y. Dec. 29, 2021) ("When . . . the Court of

Appeals denies leave to appeal and the petitioner does not seek a writ of certiorari from the United States Supreme Court, the judgment of conviction becomes final 90 days after the denial of leave to appeal.").

AEDPA also provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation" as described above.  28 U.S.C. § 2244(d)(2).  A motion for vacatur under C.P.L. § 440.10 is an "application for State post-conviction or other collateral review" that tolls the limitations clock under 28 U.S.C. § 2244(d).  *See Pratt v. Greiner*, 306 F.3d 1190 (2d Cir. 2002).

Second, the applicant must have "exhausted the remedies available in the courts of the [s]tate" on the one hand, or on the other, "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b).  As a practical matter, this provision of AEDPA requires that a state prisoner seeking federal habeas relief "'fairly present' his constitutional claim to the state courts."  *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014).

Third, the applicant's state-court conviction must not "'rest[] on a state law ground that is independent of the federal question and adequate to support the judgment.'"  *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  The question of whether a state procedural ruling is adequate is itself a question of federal law.  *See Lee v. Kemna*, 534 U.S. 362, 375 (2002).  At the same time, only a "firmly established and regularly followed" state practice may be invoked to prevent subsequent review of a federal constitutional claim.  *Ford v. Georgia*, 498 U.S. 411, 424 (1991).

## **ARGUMENT**

Before unpacking the merits of Mr. Covlin's petition, it is necessary to show that Mr. Covlin has satisfied all the procedural requisites for review, namely, that (a) his petition is timely; (b) he has exhausted his state-court remedies; and (c) there is no state-law procedural default barring federal review of his petition.

As to the merits of his petition, Mr. Covlin is in custody because the prosecution blatantly violated his constitutional rights under the Sixth and Fourteenth Amendments. Specifically, this petition is based upon (a) pervasive prosecutorial misconduct in violation of due process under *Berger v. United States*, 295 U.S. 78 (1935); (b) the trial court's admission of misleading evidence important to the prosecution's case in chief in violation of due process under *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); (c) the trial court's refusal to allow Mr. Covlin to cross-examine a witness important to the people's case in chief in violation of his right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004); (d) the trial court's admission of propensity evidence in violation of due process under *Payne v. Tennessee*, 501 U.S. 808 (1991); and (e) the People's failure to preserve potentially exculpatory evidence in violation of due process under *Arizona v. Youngblood*, 488 U.S. 51 (1988).

Accordingly, this Court should grant Mr. Covlin a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.      **Mr. Covlin Has Satisfied All the Procedural Requisites for Review.**

### A.      **Mr. Covlin's Petition Is Timely.**

Applying the statutory requirements for timeliness set forth above, the timeline of Mr. Covlin's case is as follows. His conviction was "final" within the meaning of AEDPA ninety days after the New York Court of Appeals declined to review his case. Further, because the New York Court of Appeals denied his petition on August 31, 2022, the date his conviction

became final was November 29, 2022—ninety days later.  From November 29, 2022, the time

ran until Mr. Covlin filed his C.P.L. § 440.10 motion on June 26, 2023, at which time the clock

paused at 209 days.  The trial court denied his C.P.L. § 440.10 motion on January 24, 2025, and

the Appellate Division, First Department, denied his application for leave to appeal the denial of

his C.P.L. § 440.10 motion on April 22, 2025.  Thus, the clock began to run again on April 22,

2025.  Therefore, Mr. Covlin has until September 25, 2025—the 365th day.  This petition for

habeas corpus is therefore being filed on the 359th day of Mr. Covlin's year-long limitations

period.  Accordingly, Mr. Covlin's habeas petition is timely submitted to this Court.

### B.    Mr. Covlin Has Exhausted His State-Court Remedies.

The procedural history of Mr. Covlin's case indicates he has fully exhausted the state-

court remedies available to him as to each and every claim he asserts in this petition.  As noted

*supra*, he raised the issue of prior bad act evidence—including its federal constitutional (*i.e.*, Due

Process Clause) implications—on direct appeal, and the Appellate Division, First Department,

adjudicated that claim on the merits.[15]  He also fully presented his claims arising from

prosecutorial misconduct and the admission of the prison surveillance video on direct appeal, but

the First Department did not rule on the merits of those claims.  The trial court, however, did

reach the merits of those claims on Mr. Covlin's Section 440.10 motion to vacate his conviction.

Lastly, the issue of the spoliation of the apartment keys by law enforcement was fully presented

to, and adjudicated by, the trial court in the proceedings surrounding Mr. Covlin's Section

440.10 motion.  Thus, Mr. Covlin has fully exhausted his remedies in the courts of New York as

to each constitutional claim presented here.

---

[15] At all relevant stages, Mr. Covlin specifically preserved the federal constitutional aspect of his claims.  For example, he argued on direct appeal that the People's refusal to subpoena the inmate with whom Mr. Covlin was talking in the prison surveillance video infringed "his Sixth Amendment right[] . . . to confront his accuser."

### C.    No State-Law Procedural Default Bars Federal Review of Mr. Covlin's Petition.

None of the adverse rulings from which Mr. Covlin now seeks relief were premised on state-law procedural rulings.  This is true with respect to the First Department's adjudication of Mr. Covlin's prior bad act evidence claims and the trial court's rulings on the other claims for relief.  As to the court's rulings in particular, we note that although none of the court's decisions were grounded in state-law procedure, there are two instances of dicta the opposition may seek to characterize as procedural.  However, neither of them can be the basis for a default in this case.

The first is the trial court's observation that "defense counsel did not request a missing witness charge for the inmate depicted in the video."  Court Op. ¶ 15 (citing C.P.L. § 470.05(2) and *People v. Bynum*, 70 N.Y.2d 858 (1987).  This fact is irrelevant since the defense clearly and frequently objected to the prosecution's use of this silent surveillance video absent calling the inmate in question.  This issue was well litigated before and during the trial.  The trial court's determination was based on a number of grounds, including that (1) a DOC custodian testified to authenticate the footage; (2) there was no audio in the surveillance video and "the jury just watched the actions of the two individuals depicted in the video"; (3) the absence of testimony by the inmate was not relevant; (4) reviewing the surveillance video was not a "key moment for the jury"; (5) there was other evidence establishing Mr. Covlin's knowledge of taekwondo; and (6) there were "many other layers of circumstantial evidence that built this complicated case."  Court Op. ¶ 14.  Moreover, that defense counsel did not request a missing witness charge is not an independent, legally sufficient basis for denying Mr. Covlin's claim.  It is true that "[g]enerally, a petitioner's failure to lodge a contemporaneous objection under N.Y. C.P.L. § 470.05(2) constitutes a procedural default as an independent and adequate state law ground for the state court's decision."  *Sistrunk v. Towns*, 2024 WL 5156204, at *3 (S.D.N.Y. Dec. 18,

45

2024) (citing *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011)).  But it is decidedly not a "firmly established and regularly followed" practice in New York to refuse to reach the merits of a claim that *was* contemporaneously objected to merely because the petitioner did not also request a specific charge.  And *Bynum*, in which the Court of Appeals merely declined to reach an issue that "was not asserted at trial," is not to the contrary.  70 N.Y.2d at 859.

The only other potentially arguable basis for procedural default is the court's assertion that defense counsel failed to adequately object to the People's use of the blown-up photograph of Ms. Covlin's bed.  *See* Court Op. ¶ 23.  As with the missing-witness charge issue discussed above, the defense's failure to object was one of numerous factors cited by the court in reaching its decision.  Moreover, the court's observation is not material to the claim Mr. Covlin actually asserts here.  Although it may well have been unconstitutional in itself for the People to have blown the photo up and held it out as a separate piece of visual evidence, this is not the only basis for Mr. Covlin's prosecutorial misconduct claim.  Far more relevant to the claim were the prosecution's affirmative misstatements about what was depicted in the photo and when the photo was taken, which are themselves only one part of the overall course of misconduct.  And those, the trial court acknowledged, *were* contemporaneously objected to.  *Id.*  Therefore, Mr. Covlin faces no state-law procedural default barring federal review of his petition.

For these reasons, Mr. Covlin has satisfied all the procedural requisites for review: (a) his petition is timely; (b) he has exhausted his state-court remedies; and (c) there is no state-law procedural default barring federal review of his petition.

## II.    The Prosecution Violated Mr. Covlin's Sixth and Fourteenth Amendment Rights to the United States Constitution

The prosecution violated Mr. Covlin's constitutional rights under the Sixth and Fourteenth Amendments to the United States Constitution.  Specifically, his rights were violated

by (a) pervasive prosecutorial misconduct in violation of due process under *Berger v. United States*, 295 U.S. 78 (1935); (b) the trial court's admission of misleading evidence important to the prosecution's case in chief in violation of due process under *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); (c) the trial court's denial of Mr. Covlin's right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004); (d) the trial court's admission of propensity evidence in violation of due process under *Payne v. Tennessee*, 501 U.S. 808 (1991); and (e) the People's failure to preserve potentially exculpatory evidence in violation of due process under *Arizona v. Youngblood*, 488 U.S. 51 (1988).

### A.    Mr. Covlin's Right to Due Process Was Violated by Pervasive Prosecutorial Misconduct.

To say that Mr. Covlin's trial was rife with prosecutorial misconduct may understate the nature and severity of the case. As a result of this egregious violation of Mr. Covlin's right to due process, this Court should grant his petition.

Prosecutorial misconduct can violate a criminal defendant's due process rights under the Fourteenth Amendment. The U.S. Supreme Court has explained that prosecutorial misconduct violates the due process clause when the prosecutor's improper argument "so infects the trial with unfairness as to make the resulting conviction a denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 13 (2004). In *Berger v. United States*, 295 U.S. 78 (1935), the prosecutor repeatedly engaged in misconduct, including misstating evidence and using improper argumentation in front of the jury resulting in the Supreme Court's reversal of defendant Harry Berger's conviction:

> [The prosecutor] was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said

> and persistently cross-examining the witness upon that basis; of
> assuming prejudicial facts not in evidence; of bullying and arguing
> with witnesses; and, in general, of conducting himself in a
> thoroughly indecorous and improper manner.

*Id*. at 84.

Federal appellate jurisprudence recognizes numerous other forms of prosecutorial

misconduct as implicating the due process clause.  One prominent example is unsworn testimony

by a prosecutor.  *See, e.g.*, *United States v. White*, 545 F. App'x 69, 71 (2d Cir. 2013) ("An

attorney who acts as an unsworn witness should be disqualified as counsel, in part to prevent the

attorney from 'subtly impart[ing] to the jury his first-hand knowledge of the events without

having to swear an oath or be subject to cross examination.'").  Another is a prosecutor's

"comments which indicate to the jury that in order to acquit the defendant they must find that the

complainant lied," which courts have found to be "improper and prejudicial, since such

comments tend to divert the jury's attention away from the central issue of identification and to

shift the burden of proof thereon to the defendant."  *Woolcock v. People*, 2012 WL 4344191, at

*16–17 (E.D.N.Y. Sept. 21, 2012) (quoting *People v. Langford*, 153 A.D.2d 908 (2d Dep't

1989)).

These examples express the underlying principal that "[w]hen specific guarantees of the

Bill of Rights are involved, [the Supreme Court] has taken special care to assure that

prosecutorial conduct in no way impermissibly infringes them."  *Donnelly v. DeChristoforo*, 416

U.S. 637, 643 (1974).  This is because a prosecutor is a "representative not of an ordinary party

to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as

its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that

it shall win a case, but that justice shall be done."  *Berger* 295 U.S. 78 at 88.  And it is for

precisely this reason the Court has unambiguously stated that while a prosecutor "may strike

hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Id*.  The reason it is so important for a prosecutor to fulfill his or her duty is that "the average jury . . . has confidence that these obligations . . . will be faithfully observed.  Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."  *Id*.

For its part, the Second Circuit employs a three-factor balancing test for "assessing whether a prosecutor's remark rises to the level of prejudicial error[:] . . . the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct."  *United States v. Mensah*, 110 F.4th 510, 529 (2d Cir. 2024).  Moreover, the Supreme Court precedents set forth above are significant here because habeas relief is also appropriate where a state court's judgment is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Applying the *Mensah* test's first prong, "the severity of the misconduct," the severity of ADA Bogdanos' misconduct is apparent in its breadth and its depth.  *Mensah*, 110 F.4th at 529.  The severity of individual instances of his misconduct were nearly overshadowed by how rampant his misconduct was on display in his summation, not least because it was replete with improper statements and arguments to the jury, all of which amount to a violation of Mr. Covlin's due process rights, *Romano*, 512 U.S. at 13:

- Distorting a photograph to suggest a "wet spot" and falsely claiming it was taken in the morning to mislead the jury into believing Mr. Covlin attacked Ms. Covlin in the

bedroom and that Mr. Covlin had used seltzer to clean blood off of the bed, which created the alleged "wet spot";

- Misrepresenting a series of blood-spatter photos as to when they were taken and what they illustrated to support that same false factual inference that Mr. Covlin attacked Ms. Covlin in the bedroom;

- Misrepresenting the photographs and when they were taken to illustrate the number of rips in Ms. Covlin's bed sheets for the same purpose;

- Misrepresenting testimony about the building's surveillance cameras because the actual testimony was inconsistent with the People's theory;

- Manipulating expert testimony as to whether Ms. Covlin suffered from osteoporosis to elicit the inference that she did not;

- Claiming that to believe Mr. Covlin did not commit the crimes charged, the jury must believe that all of the prosecution's witnesses were liars;

- Relying on a tampered-with crime scene since objects had been removed and rearranged, and asserting without evidence that Mr. Covlin was to blame for the changes—thus, improperly shifting the burden to Mr. Covlin to call witnesses to prove he was never in the apartment following the morning in which he and his daughter found Ms. Covlin's body;

- Improperly claiming without evidence that Mr. Covlin was attempting to create a false alibi by leaving the building twice during the early morning hours;

- Falsely claiming the window of Ms. Covlin's time of death was 1:25 a.m. to 4:25 a.m. when the evidence showed that Ms. Covlin could have died any time after 10:13 p.m. and before 4:25 a.m.

Additional examples of ADA Bogdanos' misconduct include repeatedly acting as an unsworn witness, which is another clear violation of due process. *White*, 545 F. App'x at 71. He

testified to everything from the nature of the apartment keys to the cleaning properties of seltzer water to the import of his own personal military service to the prosecutor working for the jury. The prosecutor also violated Mr. Covlin's due process rights by presenting a series of fifty slides to the jury to dramatically make the point that "to acquit [Mr. Covlin], [the jury] must find that the [witnesses] lied"—another severe act of misconduct. *Woolcock*, 2012 WL 4344191, at *16–17 (quoting *Langford*, 153 A.D.2d at 908). In light of this sampling of ADA Bogdanos' misconduct, it is clear that the first prong of the *Mensah* test, "the severity of the misconduct," has been satisfied. *Mensah*, 110 F.4th at 529.

The second prong of the *Mensah* test references the "means adopted to cure the misconduct." *Id.* Although during the trial, the court referenced a curative instruction to the jury to assess the veracity of the silent surveillance video, nowhere else did the court even attempt cure the prosecutor's glaring misconduct. To the contrary, the court approved of ADA Bogdanos' conduct, never seeing his behavior as in any way rising to the level of prosecutorial misconduct: "Defense counsel's allegations of misconduct on the part of the prosecution have no merit. After presiding over this trial, a full review of the trial transcript, all the post-conviction motions, this Court not only strongly disagrees that there was prosecutorial misconduct but is concerned that such a serious assertion was made without substantial proof." Court Op. ¶ 21. Because the trial court did not see the prosecutor as having engaged in misconduct, it had no occasion to employ any means to cure it. The court, in essence, put its imprimatur on the misconduct. As a result, ADA Bogdanos' misconduct satisfies the second prong of the *Mensah* test.

Finally, as to whether Mr. Covlin would have been convicted absent the misconduct, *id.*, the pervasiveness and severity of ADA Bogdanos' misconduct leads inexorably to the conclusion

that but for his misconduct, Mr. Covlin would not have been convicted.  The prosecutor's theory

of the case during summation depended entirely upon his improper statements and arguments to

the jury, his acting as an unsworn witness to buttress his case, and his claiming that to acquit

Mr. Covlin, the jury would have to believe that all the People's witnesses were liars.  To omit

ADA Bogdanos' instances of misconduct would turn the trial transcript into a Jefferson Bible—

leaving nothing for a reasonable jury to work with to render a just verdict.

And we do not have to speculate as to whether Mr. Covlin would have been convicted

absent the misconduct: the jury's request to see the "[p]hoto of master bedroom fitted sheet

(rip/wet stain) introduced in summations" indicated that it had already been influenced by the

prosecutor's various distortions:

- His misstatement as to when the photos of the ripped sheet were taken;

- His misstatement as to when the photo of the "wet stain" was taken;

- His misstatement that there was a "wet stain" despite there being no evidence of
  such (and in fact in contradiction to police officer testimony that the bed was dry
  that morning); and

- His introduction of the manipulated photograph for the first time during
  summation.

Applying *Berger* to the facts of this case is like a mirror reflecting ADA Bogdanos'

conduct throughout trial.  Like the prosecutor in *Berger*, ADA Bogdanos mischaracterized

witness testimony in order to support the People's factual narrative—in some cases by asserting

that testimony was the opposite of what it actually had been, as with Eve Karstaedt's testimony

concerning the security cameras.  Like the prosecutor in *Berger*, the ADA assumed a plethora of

prejudicial facts not in evidence, most notably that Mr. Covlin attempted to engineer a false alibi

even though he did not put on an alibi defense. And like the prosecutor in *Berger*, he "conducted himself in a[n] . . . indecorous and improper manner" by denigrating the defendant and defense counsel. 295 U.S. at 84. Here, ADA Bogdanos improperly claimed that defense counsel's questions were designed to confuse the jury and that defense counsel was trying to mislead the jury. *See* Tr. 4631:7-4632:8.

Indeed, the only respect in which *Berger* is not squarely on point with ADA Bogdanos' conduct is that he went even further than the prosecutor in *Berger*. He blatantly mischaracterized a multitude of visual evidence so that it provided support (where there otherwise would have been none) for the People's theory. And when that mischaracterization was challenged, he stated that he "misspoke"—an entirely implausible assertion, given how directly the People's case and theory depended on the very misrepresentations he made. What's more, his assertions that the jury would have to find all the People's witnesses to be liars to acquit Mr. Covlin, buttressed as they were by screaming visual aids, were so brazen that the People were not even able to characterize them after the fact as honest mistakes.[16]

ADA Bogdanos' misconduct was unlawful not only because it betrayed the prosecutorial duty to seek justice, but its greater consequence is that it corrupted the fact-finding function itself. The trial court's finding that the record contained "overwhelming evidence of defendant's guilt" rested on a structure built from misrepresentation and falsehood. That conclusion cannot stand when the supposed evidence is stripped of the prosecution's distortions. Remove those distortions, and nothing remains to support the verdict. For this reason, the ADA's misconduct and the trial court's blessing of that misconduct resulted in a decision that was "contrary

---

[16] Curiously, for direct appeal, the People initially refused to turn over to the defense a copy of the slides used by the People in their summation.

to . . . clearly established Federal law" and "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The examples of pervasive prosecutorial misconduct set forth above show that the prosecution violated Mr. Covlin's right to due process.  Accordingly, his petition for habeas relief should be granted.

**B.     Mr. Covlin's Right to Due Process Was Violated by the Trial Court's Admission of Misleading Evidence Important to the Prosecution's Case in Chief**

Mr. Covlin's right to due process was also violated by the trial court's admission of misleading evidence important to the prosecution's case in chief, namely, the silent prison surveillance video that the People argued was a confession.  Because the trial court permitted the jury to see, and place undue weight upon, this piece of evidence, this Court should grant Mr. Covlin's petition.

The admission of "specific misleading evidence important to the prosecution's case in chief" may constitute a violation of due process.  *Donnelly*, 416 U.S. at 647.  Indeed, federal case law establishes that "manipulation" of evidentiary material "to create false or misleading documents, knowing that such information was false or misleading at the time" of trial amounts to a "constitutional violation."  *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015); *see also United States v. Welshans*, 892 F.3d 566, 574 (3d Cir. 2018) (cleaned up) ("The Government may run afoul of a defendant's due process right to a fair trial by systematically injecting inadmissible evidence at trial, thereby permeating the proceedings with prejudice.").

The silent prison surveillance video is a prime example of the kind of evidence referred to in *Donnelly* because it represents "specific misleading evidence important to the prosecution's case in chief."  *Donnelly*, 416 U.S. at 647.  Indeed, the video was so important to the prosecution's case that ADA Bogdanos used it to argue, without admissible evidence, that

Mr. Covlin was demonstrating to a fellow inmate how he allegedly murdered Ms. Covlin.

Without audio or an eyewitness to corroborate the events captured on video, the jury was left to

speculate. The trial court's admission of the silent video was tacit approval of the prosecution's

misconduct in putting it before the jury. Yet the only documentation submitted to the trial

court—and, by extension—the Appellate Division, First Department—to support the People's

claim that the video matched their theory were documents that ADA Bogdanos redacted and

refused to provide in unredacted form, even for *in camera* review, citing facially absurd concerns

for the declarant inmate's safety. Thus, no proof other than the ADA's representations was ever

offered to show that the letter or affidavit was even signed or by whom, let alone properly

executed and notarized. Thus, the prosecutor relied on obfuscation in his effort to see the silent

video admitted into evidence.

The prosecutor also relied on sophistry to convince the court to admit the video. He

reasoned that because the allegations in the inmate's redacted (purported) affidavit accurately

described what was shown in the silent video, the video confirmed all of the allegations of the

purported affidavit. This is a classic example of circular reasoning, treating the alleged match

between the affidavit and the video as evidence that the affidavit is confirmed, when, in fact, the

accuracy and reliability of the video must be assumed in order to make such a claim. But if the

affidavit was allegedly written based on the video, the fact that they align does not independently

confirm the affidavit's truth—the affidavit could just be a restatement. From here,

ADA Bogdanos drew what would necessarily be an invalid conclusion, namely, that the alleged

silent video confession of Mr. Covlin was reliable. Further, the bankruptcy of the ADA's

argumentation is drawn into sharper relief by independent evidence that the inmate recanted his

allegations and repudiated them as lies he told to avoid Mr. Covlin informing on him in his separate case.

Therefore, because Mr. Covlin's right to due process was violated by the trial court's admission of misleading video evidence important to the prosecution's case in chief, this Court should grant Mr. Covlin's habeas petition.

### C.    Mr. Covlin's Right to Confrontation Was Violated by the Trial Court's Refusal to Allow Him to Cross-Examine a Witness Central to the People's Case in Chief.

Mr. Covlin's right to confrontation was violated by the trial court's refusal to allow him to cross-examine a witness important to the people's case in chief—the prison inmate who allegedly corroborated the silent video discussed in II.B, *supra*.  Thus, this Court should grant Mr. Covlin a writ of habeas corpus to prevent a fundamental miscarriage of justice.

The classic case establishing that testimonial out-of-court statements cannot be admitted unless the witness is unavailable and the defendant had a proper opportunity for cross-examination is *Crawford v. Washington*, 541 U.S. 36 (2004).  "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  *Id.* at 68.  Further, the Court held that "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts."  *Id.* at 54.  And as if speaking directly into the case at bar, the Court held that "[d]ispensing with confrontation because testimony is supposedly reliable is akin to letting the government pick its own witnesses.  That's not what the Sixth Amendment prescribes."  *Id.* at 62.

Here, the People "picked their own witness" but went a step further by refusing to reveal the nature and extent of their relationship with the inmate, let alone allowing Mr. Covlin to cross-examine him.  If the connection between the inmate and the prosecution (or any other arm of the

state) was solid enough, then the ADA's refusal to produce the inmate violated, as a matter of

black-letter law, Mr. Covlin's Sixth Amendment confrontation right.  Furthermore, the

prosecutor's circular argument set forth above, ostensibly establishing the veracity of the

redacted affidavit, is a textbook definition of "supposedly reliable" testimony as described in

*Crawford*.  Only the People knew the contents of the affidavit.  Only the People could "testify"

to its reliability and the affiant's identity.  Yet Mr. Covlin was not afforded the opportunity—

indeed, his constitutionally enshrined right—to cross-examine him or review the full contents of

the purported affidavit.  Despite multiple requests to the trial court by the defense to produce the

witness or to review his unredacted, alleged affidavit, the trial court violated Mr. Covlin's right

to confrontation under the Sixth Amendment.  This is not an issue that can be brushed under the

rug as a matter of harmless error.  The jury specifically referred to the surveillance clip as the

"choke hold on jail video."  Its materiality, therefore, is not seriously in question.  Thus, the

inmate's testimony as to the contents of that video is equally germane.  The trial court's denial of

Mr. Covlin's right to cross-examine him hamstrung his defense and denied him a fundamental

right under the constitution.

As a result, this Court should grant habeas relief, or at minimum, order an evidentiary

hearing into what the trial court refused to probe: whether the inmate had recanted, what was

actually said at the time of the video, and the nature of his relationship with the state.

### D.    Mr. Covlin's Right to Due Process Was Violated by the Trial Court's Admission of Propensity Evidence.

Mr. Covlin's right to due process was violated by the trial court's admission of

propensity evidence—evidence from both *before and after* the alleged crime—that smeared

Mr. Covlin's reputation such that a fair trial was impossible.  For this reason, this Court should

grant this petition.

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects criminal defendants from the admission of prejudicial character evidence.  Specifically,

> federal law prohibits admitting evidence of an uncharged crime to prove a defendant's character or propensity toward crime, and such an admission could violate federal due process "if the evidence in question was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."

*Katowski v. Greiner*, 212 F. Supp. 2d 78, 86 (E.D.N.Y. 2002) (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir.1992)).  *Accord United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001) (noting that prior bad act evidence "can amount to a constitutional violation only if its prejudicial effect far outweighs its probative value").  One prominent expression of this constitutional right in U.S. Supreme Court jurisprudence can be found in *Payne v. Tennessee*, 501 U.S. 808, 825 (1991), in which the Court recognized that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."

American law has recently experienced what can only be characterized as a sea change when it comes to recognizing how thoroughly prior bad act evidence can annihilate a criminal defendant's chance at a fair trial.  At the state level, this is manifested most prominently and recently in the reversal of the conviction of Harvey Weinstein because of the degree to which that conviction was procured with evidence of the defendant's bad acts that were unrelated to the charged crime or even the alleged victims.  *See People v. Weinstein*, 42 N.Y.3d 439, 444 (2024) (holding that the trial court "erroneously admitted testimony of uncharged, alleged prior sexual acts against persons other than the complainants of the underlying crimes because that testimony served no material non-propensity purpose," and "compounded that error when it ruled that

defendant, who had no criminal history, could be cross examined about those allegations as well as numerous allegations of misconduct that portrayed defendant in a highly prejudicial light").[17]

One of the U.S. Supreme Court's recent reflections of that sea change, and the case that provides principal support to Mr. Covlin's constitutional claim concerning prior bad act evidence here, is the Court's decision earlier this year of *young v. White*, 604 U.S. ----, 145 S. Ct. 75 (2025). *Andrew*'s relevant legal holding is that the principle the Court articulated in *Payne* in 1991—in essence, that evidence in a criminal trial can be so prejudicial that it violates the federal Due Process Clause—constitutes a "holding" of the Supreme Court within the meaning of AEDPA and for the purposes of federal habeas law. *Id.*, 145 S. Ct. at 81. As a practical matter, what this means is that federal habeas corpus relief can be premised on a violation of the constitutional right articulated in *Andrew*. But the facts of *Andrew* make even clearer that its relevance to this case is not just procedural. Rather, Mr. Covlin's conviction was obtained in direct violation of the Due Process Clause holdings of *Payne* and *Andrew*.

Brenda Andrew was convicted by an Oklahoma jury of conspiring with the man she had been dating to murder her estranged husband. What made *Andrew* a federal constitutional case was the way in which the prosecution proved its case against the defendant: through an onslaught of prejudicial character evidence. "Among other things," the Supreme Court explained, "the prosecution elicited testimony about Andrew's sexual partners reaching back two decades; about the outfits she wore to dinner or during grocery runs; about the underwear she packed for vacation; and about how often she had sex in her car." *Id.* at 78–79. "At least two of the prosecution's guilt-phase witnesses took the stand exclusively to testify about Andrew's

---

[17] The Appellate Division, First Department's decision on Mr. Covlin's direct appeal in 2022 pre-dates the Court of Appeals ruling in *Weinstein* in 2024.

provocative clothing," while the prosecution elicited testimony from others about whether a good mother would behave like the defendant had.  *Id*. at 79.  The prosecution then drove these themes home in its summation, "including by displaying Andrew's 'thong underwear' to the jury, by reminding the jury of Andrew's alleged affairs during college, and by emphasizing that Andrew 'had sex on [her husband] over and over and over' while 'keeping a boyfriend on the side.'"  *Id*.

In sum, with *Andrew*, the Supreme Court confirmed that *Payne*'s principle of prejudicial evidence violating due process was a "holding" for federal habeas purposes and left no ambiguity that prior bad act evidence falls squarely within the Court's understanding of what can constitute prejudicial evidence.

If any case stands as a paradigmatic example of a conviction secured by prejudicial character evidence in violation of due process, *People v. Covlin* is that case.  The People were allowed to viciously smear Mr. Covlin's character, portraying him as loathsome and criminally predisposed—and it worked.  The prior bad act evidence that the Court allowed the People to introduce ranged from petulant (taunting Ms. Covlin and calling her names in public) to decadent (his uncontrolled spending despite losing his job) to mentally unstable (his obsession with backgammon) to duplicitous (his surreptitious accessing of Ms. Covlin's email and social media).  His sexual immorality was a particular focus of the People's evidence, ranging from his multiple illicit affairs, to his excessive use of dating apps to contact potential sexual partners, to his stated desire for an open marriage.  And these were just the alleged bad acts that occurred *before* Ms. Covlin's death.  There was also a litany of allegations of bad acts that post-dated Ms. Covlin's death—which made their fundamental relevance to the case inherently suspect— and those allegations were clearly designed to paint Mr. Covlin as cartoonishly evil.  They included allegations of embezzling money from his children's college funds, defrauding a

60

landlord to get an apartment, deceiving a probate court to get access to Ms. Covlin's insurance proceeds, and having sexual affairs with various women while he emotionally abused them. The allegations also included claims of hostility toward his parents, which ranged from contemplating getting his mother fired from her job to no fewer than four different contemplated plots to kill his parents, some of which would verge on the comical if they were not used to secure a conviction leading to a life sentence.

The People's introduction of this evidence and the trial court's blessing of it clearly violate the Supreme Court's holdings in *Andrew* because they were equally as broad, as irrelevant to the ultimate issues in the case, and as clearly designed to assassinate the defendant's character as the evidence in *Andrew*. But the similarities between this case and *Andrew* go even further than that. Like *Andrew*, the prior bad act evidence in this case focused near-obsessively on the sexual promiscuity of the defendant. *Compare Andrew*, 145 S. Ct. at 79 n.1 (analyzing the *Andrew* prosecution's use of the phrase "slut puppy" in summation) *with* Ex. 385 (detailing line graphs and pie charts used by the prosecution to detail the hundreds of women Mr. Covlin contacted in a typical month for purposes of sexual contact). Also, like *Andrew*, the prior bad act evidence admitted at Mr. Covlin's trial consisted of a substantial amount that was so remote in time from the charged offenses as to be intrinsically suspect when it came to fundamental relevance. In *Andrew*, much of the evidence of prior bad acts dated back years before the defendant met the alleged victim. Similarly, here, the propensity evidence against Mr. Covlin occurred years after the alleged victim's death.

In upholding Mr. Covlin's conviction, the Appellate Division, First Department, identified several purportedly anodyne reasons that the People needed to introduce what would otherwise have been scathingly prejudicial character evidence. For example, the appellate court

61

held that "[e]vidence of defendant's extramarital affairs and assault on his wife provided context for the separated couple's marital strife and generally supported an inference that defendant would expect to be disinherited in his wife's will soon, providing a motive to kill her before she could do so." *Covlin*, 205 A.D.3d at 580. Even if "context for the separated couple's marital strife" were a valid reason to introduce a multitude of sexual promiscuity allegations, it is not permissible under the Supreme Court's due process precedents. After all, very similar logic could have been used to justify the admission of the improper evidence in *Andrew* because it proved the defendant's extramarital affair as a motive to kill her husband—and, in fact, it was used for that purpose. Indeed, the Oklahoma state courts upheld the use of that evidence because they concluded it showed that Andrew's paramour (who pulled the trigger at her inducement) "'was just the last in a long line of men that she seduced.'" *Andrew*, 145 S. Ct. at 79.

Mr. Covlin's conviction, built entirely on circumstantial evidence, was secured through the prosecution's relentless character assassination. Under *Andrew*, *Payne*, and their predecessors, this offends the Due Process Clause. Thus, Mr. Covlin's petition should be granted.

### E.    Mr. Covlin's Right to Due Process Was Violated by the People's Failure to Preserve Potentially Exculpatory Evidence.

Because the People failed to preserve potentially exculpatory evidence in the form of keys to Apartment 515—Ms. Covlin's apartment—Mr. Covlin's right to due process was violated. As such, this Court should grant his petition for relief under 28 U.S.C. § 2254.

In *California v. Trombetta*, 467 U.S. 479 (1984), the Supreme Court held that due process requires that the government preserve potentially exculpatory evidence before its destruction. "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's

defense." *Id.* at 488.  The Court's holding in *Trombetta* was later refined in *Arizona v. Youngblood*, 488 U.S. 51 (1988), to establish that the failure by law enforcement to preserve potentially exculpatory evidence can constitute a due process violation if the "defendant can show bad faith on the part of the police," which bad faith "necessarily turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56.

The NYPD initially vouchered the sets of keys to Ms. Covlin's apartment, found shortly after her body was discovered in 2010.  They were not, however, retained by the People for trial, nor were they ever tested for DNA evidence.  Nevertheless, the People sought to establish that Mr. Covlin accessed Apartment 515 by using one of the apartment's four sets of keys.  As a result, the People could and should have tested the keys, or at least retained them for trial. Instead, the NYPD and the D.A.'s Office failed to do so, preventing Mr. Covlin from challenging, or even examining, a crucial piece of potentially exculpatory evidence.  Thus, the People's failure to preserve the apartment keys made such evidence inculpatory.  The People had almost three years before the evidence was destroyed to perform testing.  They tested other items but for some reason clearly did not want to know the result of DNA testing on the keys.

ADA Bogdanos' summation shows how important the apartment keys were to his theory of the case:

> Let's talk about these four keys.  Rose told you that there were four keys; one for her, one for Shele, one for the building—you have to give it to the building downstairs so they can get in for emergencies—and one that was supposed to go to her mother. Supposed to, but didn't.
>
> And then we have the defendant, himself, telling two separate girlfriends when he's recounting what happened and they are asking him, how did you get in?  Well[,] I just used my key.  In an

>unguarded moment, with two girlfriends, at different times; I used my key. That's the defendant's words.[18]

(Tr. 4605:15-4606:1.)

Then, a little later in the summation:

>[O]n January 17th when the police officer and the family was trying to get into the apartment to look for the children's clothing and toys, none of them could work the lock. And the defendant took the lock, took the key, put it in the lock, opened it as easy as pie.

>It is a new lock. He shouldn't have been able to do that. That is a new lock, how did he know how to work it? That is a new lock, how did he succeed when everyone else who tried failed? Because it wasn't the first time he had used a key on that new lock.

(Tr. 4606:13-23.)

The People's reliance on the keys exposes their obvious exculpatory value, something that should have been apparent to law enforcement when they were vouchered, or sometime during the nearly three years before they were destroyed while they were conducting DNA analysis on many other items. This makes the NYPD and D.A.'s Office's failure to preserve them a blatant violation of Mr. Covlin's due process rights. In a case where a former resident is suspected of illicitly entering an apartment after the locks were changed, the importance of any set of keys would be immediately apparent to any reasonable law enforcement officer or prosecutor. Certainly, the People knew that the keys would play "a significant role in [Mr. Covlin's] defense." *Trombetta*, 467 U.S. at 488. Therefore, Mr. Covlin was denied due process by the spoliation of the apartment keys.

---

[18] This was not a mistake but a deliberate distortion of the record. Jodi Johnson—one of the "girlfriends" the prosecutor invoked—never testified that Mr. Covlin had a key after the locks were changed in May 2009 or that he used one to enter Apartment 515 on December 30, 2009. Her testimony was far more limited and she stated "I don't recall if this conversation [about the keys] was during that phone call, or at work, or any time in between." (Tr. 2583:16-17; 2584:2-3). The prosecutor's claim to the contrary was pure invention.

This Court should, thus, grant his habeas petition, or alternatively, order an evidentiary hearing to assess the prejudice caused by the People's failure to preserve this potentially exculpatory evidence.

## **CONCLUSION**

For the foregoing reasons, pursuant to 28 U.S.C. § 2254, Mr. Covlin respectfully requests this Court issue a writ of habeas corpus on the basis of his unconstitutionally obtained conviction of second-degree murder, vacate the conviction and/or sentence, and grant such further relief as law and justice may require.  Because the constitutional violations described above had a substantial effect on the outcome of Mr. Covlin's trial, federal intervention is appropriate and necessary.  Minimally, Mr. Covlin respectfully requests an evidentiary hearing on the issues raised in this petition under 28 U.S.C. § 2254(e)(2).


Dated: September 19, 2025
        New York, New York

                                        Respectfully submitted,

                                        Zuckerman Legal Group

                                        By:    */s/ Seth J. Zuckerman*
                                               Seth J. Zuckerman

                                               14 Penn Plaza, Suite 814
                                               New York, New York 10122
                                               Tel: (212) 563-5655
                                               seth@zuckermanlegalgroup.com

                                               *Attorneys for Petitioner*
                                               *Roderick Covlin*

## <u>VERIFICATION BY SOMEONE ACTING ON PETITIONER'S BEHALF<br>PURSUANT TO 28 U.S.C. § 2242</u>

I am submitting this verification on behalf of the Petitioner because I am the attorney for Petitioner. I have discussed with the Petitioner the events described in this Petition. Based on those discussions, I hereby verify that the statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated: September 19, 2025
      New York, New York

                Respectfully submitted,

                Zuckerman Legal Group

                By:    */s/ Seth J. Zuckerman*
                      Seth J. Zuckerman

                14 Penn Plaza, Suite 814
                New York, New York 10122
                Tel: (212) 563-5655
                seth@zuckermanlegalgroup.com

                *Attorneys for Petitioner*
                *Roderick Covlin*